15518

STATE v. EVANS

(25 S. E. (2d), 492)

464

July,
1942.

*Mr. C. Y. Brown* and *Mr. D. W. Galloway,* Both of Spartanburg, S. C., Counsel for Appellant,

*Mr. Samuel R. Watt,* Solicitor, of Spartanburg, S. C., appeared for the State, Respondent.

MR. ASSOCIATE JUSTICE FISHBURNE delivered the unanimous opinion of the Court:

The indictment in this case is based upon Section 1112, 1942 Code, the pertinent portion of which reads as follows: "Any person * * * who shall use or employ, or advise the use or employment of, any instrument or other means of force whatever, with intent thereby to cause or procure the miscarriage or abortion or premature labor of any such woman, unless the same shall have been necessary to preserve her life, or the life of such child, shall, in case the death of such child or of such woman results in whole or in part therefrom, be deemed guilty of a felony, and, upon conviction thereof, shall be punished by imprisonment in the penitentiary for a term not more than twenty years nor less than five years. But no conviction shall be had under the provisions of this section upon the uncorroborated evidence of such woman."

The abortion was performed upon Inez Crawford, a young woman eighteen years of age, on June 23, 1942, by Henrietta Henderson, a former Negro midwife, at her home some miles out of the city of Spartanburg. This criminal operation was followed by miscarriage and death, on June 26th, and the defendant was indicted for his alleged part in the crime.

From a judgment of conviction the defendant appeals to this Court, raising two issues, the first of which imputes error to the lower Court in admitting over objection the testimony of Sheriff S. M. Henry, in which he undertook to testify to certain statements made by Henrietta Henderson in the presence of the defendant, William E. Evans, while both of them were under arrest in the county jail.

Sheriff Henry and two others officers arranged an interview in which Evans was confronted by Henrietta Henderson, who made accusatory statements to Evans, or in his presence, tending to incriminate him in the procurement of the criminal abortion. This testimony is not over long, and we quote it:

"Q. Whom did you bring into the room, into Mr. Evans' presence? A. Brought Henrietta Henderson.

"Q. What did she state to Mr. Evans, and in his presence? A. She stated that Mr. Evans had come over to her house, after the car had left her house and the girl; and after she arrived home the girl was at her house a couple of hours, something like that, Mr. Evans come back to her house and stayed for some time; and she carried her out and done the job what she stated. She said that she used something, some instrument on this girl * * *.

"Q. What did she say she used it for? A. For to cause a miscarriage.

"Q. Where did she say that took place? A. In her house in the back room, in the presence of Mr. Evans.

"Q. Where did she tell Mr. Evans he was sitting? A. In the room just opposite, on the couch or lounge; said her husband was there with him

"Q. What happened, when they came out of the room? A. The girl had Ten Dollars folded up in her hand, and give it to Henrietta, and told her Mr. Evans give her the Ten Dollars to give Henrietta * * *.

"Q. Wait a minute: What did she say about—did Mr. Evans say anything about he was responsible for it?

"The Court: Don't lead the witness.

"Q. Do you remember what she said and what Mr. Evans said? A. She said Mr. Evans told her that he was the cause of the woman being in that fix.

"Mr. Brown: We are reserving our exceptions * * *.

"Mr. Watt: Q. How did she say she left there? How did she say they left there? A. Said he promised her another Five Dollars; and he left there with her in the outomobile.

"Q. When she finished telling it, what did Mr. Evans say to Henrietta? A. Well, he denied it.

"Q. What else did he say? When Henrietta told him: 'Mr. Evans, you came by my house after the girl had died, and tried to get me to leave,' what did he say? A. He said he did not do it."

Cross Examination.

"Mr. Brown: Now, subject to our objection and exceptions, we will ask these questions:

"Q. Now, Sheriff, Mr. Evans denied his guilt before and after he saw Henrietta, did he not? A. Yes, sir; he denied it."

There are two questions relative to the reception of this testimony: Was the evidence competent under the rules governing the introduction of confessions and admissions? And, Was its admission prejudicial to the defendant as violating the hearsay rule? If, by the admission of testimony which should not have been received, it is probable that the minds of the jury were influenced to a

greater degree against the defendant than if no such testimony had been received, then the error would be deemed prejudicial to the defendant. *Entzminger v. Seigler,* 186 S. C., 194, 195 S. E., 244.

The appellant contends that the foregoing testimony was inadmissible under the rule announced in *State v. Hester,* 137 S. C., 145, 134 S. E., 885, to the general effect that testimony as to the failure of a defendant to deny or refute a charge of guilty, made when he is under arrest and in the presence of officers, is inadmissible in evidence in his subsequent trial; that under such circumstances he may stand mute, and his silence will not be taken as a tacit admission of guilt. The *Hester case* is not applicable here, because the defendant did not maintain silence.

The evidence, however, is objectionable and inadmissible upon another ground. The defendant not only did not stand mute, but made a complete and positive denial of the incriminating statements made by Henrietta Henderson, and under these circumstances the testimony should have been excluded.

Statements accusing or incriminating accused made in his presence, but unequivocally denied by him *in toto,* are not admissible against him. They do not show an admission, and are not admissible merely because made in his presence. The defendant's denial of the third person's statement destroys entirely the ground for using it. *State v. McIntosh,* 94 S. C., 439, 78 S. E., 327; 22 C. J. S., Criminal Law, § 734, p. 1265; *Pinn v. Commonwealth,* 166 Va., 727, 186 S. E., 169; Wigmore on Evidence, 3rd Ed., Volume 4, Section 1072, Page 74 *et seq.*

The testimony of Sheriff Henry also violated the rule against hearsay, and on this ground was inadmissible. But did the reception of this evidence constitute prejudicial error? The defendant upon his trial was confronted by the witness Henrietta Henderson, and fully exercised his privilege of cross examining her, and her tes-

timony went much further than the statement she made to the sheriff in circumstantial detail. While the testimony of Sheriff Henry should not have been received, this, in our opinion, did not result in prejudicial error nor affect the result of the verdict, as we shall attempt to show.

It is plain, we think, that the State did not rely for conviction upon the testimony of Sheriff Henry, who was the ninth and last witness offered by the prosecution. Henrietta Henderson, also indicted, had pleaded guilty, and was offered by the State as its first witness. Her testimony showed, step by step, the direct connection of the defendant, Evans, with the crime charged against him. From this testimony, and from that of many other witnesses, the jury was amply justified in believing that the defendant initiated and planned the procurement of the abortion, and was present in the Negro woman's house, in an adjoining room, while it was being performed. She testified that the defendant brought the girl to her home and solicited her to perform the criminal operation, and admitted that he was responsible for her condition. It is admitted that Inez Crawford had been employed by the defendant in his undertaking establishment as a receptionist about four months before her death, and that she had her living quarters there. It is further shown that within a few hours after Henrietta Henderson had been arrested and imprisoned, the defendant secured bondsmen for her release at a cost to him of $30.00, and that he immediately thereafter interviewed her in the effort to suppress her evidence against him. That before her arrest he went out to her home in the country and attempted to get her to flee, which she refused to do.

No contention is made that there was not sufficient evidence to warrant the submission of the case to the jury, so that we will not attempt a résumé of all of the evidence. But it should be stated that the testimony of Henrietta Henderson is corroborated not only by her husband who said he was present in the house with the defendant when the oper-

ation was performed, but by numerous other witnesses. Incriminating circumstances testified to by witness, after witness, some of whom were his employees, all indisputably point to the defendant's guilt. Every element of the crime is proved by overwhelming evidence, independently of the statement testified to by the sheriff, and the error of the Court in admitting his statement may safely be. disregarded as harmless.

After a thorough examination of the whole record, we are convinced that the testimony did not affect the result of the trial, and its admission did not invade a substantial right of the defendant. In the light of the testimony in this case, we do not believe that an intelligent and honest jury could be impaneled who, with a due regard for their oaths and the testimony, could legitimately come to any conclusion other than that the appellant was guilty.

Where guilt is conclusively proved by competent evidence, and no other rational conclusion could be reached but that the defendant is guilty, a judgment of conviction should not be set aside because of unsubstantial errors not affecting the result. *State v. Ford,* 3 Strob., 517, 526, 34 S. C. L., 517, 526; Wigmore on Evidence, 3rd Ed., Volume 1, Section 21.

The rule approved by this Court was clearly stated by Judge O'Neall in *State v. Ford, supra,* as follows: "According, however, to a well settled rule in criminal cases, if the prisoner's guilt were clearly made out by proper evidence, in such a way as to leave no doubt in the mind of a reasonable man, his 'conviction ought not to be set aside because some other evidence was received which ought not to have been.' This rule is, I know, to be tenderly and cautiously applied; and I would be the last man on earth to apply it where there was room to doubt. But when I know that the prisoner's guilt is as plainly made out by the other evidence, as it is possible to be done, I should feel that I was literally

straining at a gnat, while, in fact, I was swallowing a camel, if I hesitated in applying it to this cause."

The second question presents for review the action of the action of the presiding Judge in continuing the session of the Court after the hour previously announced for adjournment had been reached. It is contended that in so doing he forced the defendant to take the stand prior to the time planned by his counsel, and that the Court took over the direction of the defense; that counsel was taken by surprise, and had no opportunity to consult with their client with reference to the testimony which had been given against him earlier in the day.

The trial of this case was commenced on July 27, 1942, and ended the next day. At the time referred to, on the first day of the trial, the State had introduced nine witnesses, and the defense eight. It is not entirely clear from the record, but it may be inferred that announcement had been made that the sessions of the Court would run from 9:30 a. m. to 1 or 1:30 p. m., and from 3 p. m. to 6 p. m. After the conclusion of the testimony given by the eighth witness for the defense, this occurred:

"Mr. Brown: We wish now to ask that Your Honor suspend until tomorrow morning; we have a witness that will be here. We'll have them here. Your Honor announced the hours of Court would be 9:30 to 1:00 or 1:30, and 3:00 to 6:00, and we made our arrangements to work accordingly * * *.

"The Court: Is there nothing else you can do, Gentlemen, between now and seven o'clock? Let the jury go in the room there. (Jury retires) I am not going to lose this hour if I can help it; if you have anybody else, we will go on. How about the defendant—are you going to put him up?

"Mr. Brown: After the witness we will have here is what we had in mind. We have here eliminated a lot * * *.

"The Court: Put the defendant up—you've got an hour for that. Bring the jury back. (Jury returns). Proceed, Gentlemen."

The granting or the refusal of an adjournment or suspension of a trial of a criminal case rests in the sound discretion of the trial Court, and the Court in the exercise of its discretion, if the rights of the accused are not thereby prejudiced, may determine that the session shall open at an hour other than the customary opening hour, or that the session shall continue after the customary hour of adjournment. 23 C. J. S., Criminal Law, § 985, p. 329.

The question for decision here is whether the rights of the accused were prejudiced, as claimed, by extending the session beyond 6 o'clock p. m. The record shows that counsel made no statement to the Court that he desired time or opportunity to consult with his client, the accused, prior to offering him as a witness; nor does it appear that surprise, if present, worked to his disadvantage. Nor does the examination of the defendant by his counsel reveal that any additional time was needed. In fact, while the direct examination of the defendant was proceeding, it was interrupted by the adjournment of Court for the day, and this examination was resumed by defendant's counsel the next morning, so that even if additional time had been needed for consultation it was offered during that period of adjournment.

We do not think that there is any merit in the suggestion that the Court assumed direction of the defense and forced the defendant to become a witness. In reply to the Court's inquiry: "And you going to put him (the defendant) up?", counsel stated, in effect, that the defendant would be offered as a witness after another witness for the defense had been examined. It appeared simply to be a question of putting the defendant on the stand before or after the witness who was expected to arrive. The action of the Court exhibited nothing more than a desire to facilitate

the progress of the trial, and, in our opinion, was not indicative of any intention to force the defendant to take the stand in violation of his constitutional right not to testify if he chose not to do so.

Appellant excepts because the Circuit Judge ordered all of the testimony taken in the trial below incorporated in the record for appeal to this Court. It is contended that only the selections we have quoted in this opinion should have been printed. There was no error. In passing upon the appeal this Court found it necessary to examine the entire record.

In our opinion, the defendant has had a fair and impartial trial, and we see no merit in the exceptions.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM, MESSRS. ASSOCIATE JUSTICES BAKER and STUKES, and CIRCUIT JUDGE WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE, concur.