### 16969

THE STATE, Respondent, v. JAMES LITTLE, PETER NATHANIEL SHORT and LEON BROCK, Appellants

(86 S. E. (2d) 875)

*A. R. McGowan, Esq.,* of Charleston, *for Appellants.*

*Gedney M. Howe, Jr., Esq., Solicitor,* of Charleston, *for Respondent,*

February 21, 1955.

LEGGE, Justice.

I concur in so much of Chief Justice Baker's opinion as holds that there was ample testimony of the guilt of the appellant Little, and that his conviction should be affirmed; but I must dissent from so much of it as holds that the judgment of the lower court should be reversed as to the appellants Short and Brock. No error of law warranting reversal has been pointed out and no such error is apparent to me upon a thorough study of the record. To reverse upon the ground that in our opinion the testimony of a witness is untrustworthy and therefore not to be believed would be to transcend the appellate powers granted to this court in Article 5, Section 4 of the Constitution, which are limited, in a law case, to "the correction of errors at law under such regulations as the General Assembly may by law prescribe." *State v. Floyd,* 174 S. C. 288, 177 S. E. 375. "The weight of the evidence and the credibility of the witnesses are matters exclusively in the province of the jury." *State v. Hackett,* 215 S. C. 434, 55 S. E. (2d) 702.

The judgment of the lower court is affirmed as to all of the appellants.

STUKES and OXNER, JJ., concur.

BAKER, C. J., and TAYLOR, J., concur in part and dissent in part.

BAKER, Chief Justice (concurring and dissenting).

At the September, 1951, term of the Court of General Sessions for Charleston County, the appellants, James Little, Peter Nathaniel Short and Leon Brock, along with Theodore Failey and Monroe Richardson (the last named two not appealing), were tried on an indictment charging them with the murder of Horace C. Wilhelm, a salesman and collector for Rhodes Furniture Company. Mr. Wilhelm was murdered in the late afternoon of February 20, 1951, which date was on a Tuesday. Due to his tender years, Richardson was tried separately, that is, as to him, a jury was impaneled and rendered a consent verdict of guilty with recommendation to mercy, and he was sentenced to hard labor in the State Penitentiary for the balance of his natural life. The first named four defendants were tried together eight days later, before another jury regularly impaneled, and by said jury were found guilty as charged. When the prosecution first rested its case a motion was made by counsel representing the appellants for a direction of verdict of not guilty, which motion was refused. And again, upon the close of all of the testimony these counsel again made a motion for a direction of not guilty as to appellants, but this motion was likewise refused. Following the verdict of the jury, the trial Judge sentenced all four of them to be electrocuted. Thereafter, the Governor of this State commuted the sentence of Failey to life imprisonment in the State Penitentiary. So far as we are informed, Failey and Richardson are now confined in said penal institution.

Upon oral argument before this Court, it was conceded by the State that except for the testimony of a witness for the prosecution, Fred Patterson, there was not sufficient evidence to bottom a verdict of guilty as to Short and Brock. Indeed, it appears from remarks made by the trial Judge in passing upon the motions for the direction of a verdict of not guilty, that as to Short and Brock, two of the appellants, and especially when passing upon the motion for a direction of verdict made at the close of all of the testi-

mony, that he primarily based the refusal thereof on the testimony of Patterson.

As stated in appellants' printed brief, in Failey's and Little's (co-defendants) written confessions, and in their alleged statements to the officers of the law investigating the murder of Mr. Wilhelm, they involved both Short and Brock, but such written and oral statements did not constitute evidence against these appellants, was ruled inadmissible as to them by the trial Judge, and the jury instructed that these statements could not be considered by it in so far as the two last named appellants were concerned. The same ruling applies as to any statement made by the defendant Monroe Richardson (whose case was disposed of as hereinbefore indicated) to the officers of the law.

There were two pistols introduced in evidence as Exhibits No. 17 and No. 18, alleged to have been in the possession of some of these defendants at the time of the murder of Mr. Wilhelm (and No. 17 in the possession of Short on Wednesday morning after the crime was committed), and that one of them was fired at that time, but there is no evidence that either one of these pistols had been recently fired. Even so, there was no admissible testimony as to Short and Brock connecting them or these pistols with the murder of Mr. Wilhelm, or his robbery which was the motive, unless it can be said that the testimony of the State's witness, Moses Pringle, did so. Pringle testified that he lived about eight feet from these appellants, who lived together. We quote from his testimony on direct examination:

"Q. Do you remember the time of Mr. Wilhelm's death? A. Yes, sir.

Q. Did you have occasion to see them on the Sunday previous to his death? A. Yes, sir, I seen four of them.

Q. Who were they? A. Leon Brock, Peter Short, Shorty Little and Theodore Failey.

Q. Did you have a conversation with them? A. Yes, sir, I loaned Peter Short fifty cents, and Shorty Little tried to sell me a gallon of paint.

Q. A gallon of what? A. A gallon of paint.

Q. A gallon of paint? A. Yes, sir.

Q. Did he say what he wanted with the money? A. Said he wanted the money to get something to eat.

Q. Were they all there together? A. Four of them.

Q. The four you named? A. Yes, sir.

Q. Did you ever see them after that? Did you see them on the Tuesday following that Sunday February 20th? A. That's right.

Q. Who did you see then? A. I saw the same four, shooting dice together.

The Court: Shooting what? A. Shooting dice.

The Court: Talk out loud, so we can hear you. A. Gambling; shooting dice."

By the Solicitor:

"Q. You say they were shooting dice? A. Yes, sir.

Q. Did you see them on the afternoon prior to your seeing them shooting dice? A. Yes, sir, I saw them Tuesday afternoon.

Q. It was on Tuesday after that Sunday. A. I see them shooting dice.

Q. What time did you see them on Tuesday? A. About ten o'clock.

Q. And did you see them in the afternoon, after that Sunday any time? A. In the afternoon?

Q. After Sunday. It was on Sunday when you loaned them fifty cents. A. Yes, sir.

Q. Then you saw them on Tuesday? A. Yes, sir.

Q. In the morning? A. Yes, sir.

Q. Did you see them in the afternoon at any time? A. Yes, sir.

Q. What happened? A. I saw them Monday afternoon, and I saw them again Tuesday morning about ten o'clock.

Q. Did you see them Tuesday afternoon? A. Yes, sir, in the afternoon Tuesday.

Q. About what time? A. Right around about, between six-thirty and seven o'clock.

Q. Was anybody else with the four? A. Not during the time.

Q. Uh? A. Not during the time I seen the four.

Q. When you saw them about six-thirty or seven o'clock, Tuesday afternoon, was anybody else with them? A. All of them together then. Another boy been along with them then, a little boy.

Q. Do you know his name? A. A little boy. I don't know him by his name, by looking at him.

Q. A little boy? A. Yes, sir.

Q. And did you see them that afternoon together? A. Yes, sir, they was standing on the corner and disappeared.

Q. That was between six-thirty and seven o'clock Tuesday afternoon. A. Yes, sir.

Q. Did you see them that morning shooting crap, or was it the following morning that you saw them shooting crap, or was it the following evening? A. They was shooting crap on Tuesday morning.

Q. Did you see them shooting crap on Wednesday morning? A. They wasn't shooting crap on Wednesday morning.

Q. When you saw them got out in the afternoon about six-thirty or seven o'clock together, these four defendants, and this other little boy, whose name you don't know, with them, did you see them the following morning after that afternoon? A. I saw them Tuesday morning.

Q. On Tuesday afternoon you said, about six-thirty or seven o'clock, you saw them go out together? A. Yes, sir.

Q. Did you see them the following morning after you saw them go out together? A. Yes, sir.

Q. After that afternoon. A. Yes, sir.

Q. So that was Wednesday morning. A. Yes, sir.

Q. You remember hearing about Mr. Wilhelm's death, don't you? A. I see it in the paper, Wednesday.

Q. Was that the same day you saw his death, that they were shooting crap? A. I saw it in the paper Wednesday.

Q. Is that the same Wednesday morning they were shooting crap? A. Yes, sir.

Q. Now, when you saw them shooting crap Wednesday, who was in the game? A. Myself, Leon Brock, Peter Short and Theodore Failey.

Q. Was Little there? A. Yes, sir, he was there, but he wasn't shooting no dice.

Q. Was there any drinking in the crowd that morning? A. Yes, sir, all us had a drink.

Q. All of you had a drink? A. Yes, sir.

Q. How many drinks did you have? A. I don't know. They had a quart and give me some of it.

Q. Well, how many drinks did you have? A. I had a pretty good sum out of it.

Q. Did anything happen in that game? A. A argument came up between Theodore Failey and Leon Brock. Peter Short had a thirty-two sidewheeler in his pocket, and it fall out.

Q. Peter Short had a thirty-two sidewheeler in his pocket, and it fell out? A. Yes, sir.

Q. Will you take a look at this pistol? Is that what you call a sidewheeler? A. Yes, sir, that's the same pistol.

Q. That's the same pistol? A. Yes, sir, fell on the floor.

Q. Well, what was Peter Short doing at that time? A. He was gambling, and he pick up the gun with his left hand, and handed it to Theodore Failey, and say he ought to slap him, and Failey say he ain't going to slap, 'cause you know what done happen.' He didn't say what happen or what, he just say he ain't going to slap him, 'Cause you know what done happen.' What happen, I don't know.

The Court: Who said that? A. That's what Failey tell Leon Brock."

By the Solicitor:

"Q. What did Brock say when he told him that? A. He didn't say nothing much.

Q. How is that? A. He didn't knock him.

Q. Well, did he say anything? A. No, sir, he cuss.

Q. Just go ahead and tell us what he said? A. He just tell him, 'you son of a bitch, I ought to slap you anyhow.'

Q. Did they have any money in this game that morning? A. Yes, sir, they had some money that morning.

Q. How much money did they have? A. When the five of them get there, they had between twenty-five and thirty dollars.

Q. What kind of liquor were you drinking? A. Moonshine.

Q. Did you buy it? A. No, sir, I didn't. They break me. I couldn't buy it."

It will be noted from the foregoing that this witness was willing to testify to anything that he realized was unfavorable to the appellants. For instance, until he finally understood that his testimony would benefit the prosecution only if he testified that he had seen the appellant shooting dice on Wednesday morning, he had them shooting dice on Tuesday morning, and had flatly denied seeing them shooting dice on Wednesday morning, the first day that the general public knew of the murder of Mr. Wilhelm, the time of which has been fixed as very late on the afternoon of Tuesday, February 20th, 1951. (It is unfortunate that counsel for appellants, on the cross-examination of this witness, did not ask him the time of day he read in the paper about the murder of Mr. Wilhelm, and the paper he was reading.) Again, in the game of dice in which this witness says he participated, he first refers to an argument between Failey and Brock, and then says that a .32 calibre pistol fell out of the pocket of Short (apparently at the time the dice were in the possession of Short) and that Short picked up the pistol and handed it to Failey, saying to him at such time that "he ought to slap him," and Failey replying "he ain't going to slap, 'cause you know what done happen.'" Yet, in the next breath, this witness says "That's what Failey tell Leon Brock," although Brock had not threatened to slap Failey. And then in order to bring Brock back into the discussion, this witness, after testifying that Brock didn't say much, under prodding from the State's counsel, gave the answer quoted on the eleventh line from the end of the

quoted testimony. Again, it is more than passing strange that with this witness and Short playing in this crap game, and he having gone "break," and therefore not playing at that time, and with Short having plenty of money or at least being able to continue in the game, this witness did not ask Short for the fifty cents he had loaned him on the Sunday before.

If as testified to by this same witness (Moses Pringle), that he saw the appellants and their co-defendant Failey together on Sunday afternoon prior to the crime committed late in the afternoon of the following Tuesday, and they were then without funds, it is likewise true that this same witness testified he saw all of the four named in a dice game on Tuesday, and before the crime had been committed, at which time they necessarily had money.

If it be admitted that the appellants now being discussed were in a crap game on Wednesday morning, were drinking untaxed liquor, and that Short had a .32 pistol in his pocket, which was identified by Pringle as the same pistol the prosecution had placed in evidence as its Exhibit 17, such is no evidence that Short and Brock had anything to do with the murder of the deceased.

We now come to the witness Patterson, who, if his testimony can be believed, has a most remarkable memory. He was in the Charleston County jail from July 8, 1950, until July 8, 1951. This was not the first jail experience of this witness. He had theretofore served time in the jail of DuVall County, Florida. In September, 1950, Patterson who as aforesaid had been in jail since July 8th, pleaded guilty in the Court of General Sessions to Assault and Battery, we assume of at least high and aggravated nature, and was sentenced to three years imprisonment. However, for some unexplained reason, and when he says no one was interested in him, so far as he knew, and didn't know anybody in South Carolina—"not friendly with them," he was granted a parole and released from jail in July, 1951. (It is obvious that Patterson was paroled before serving one-third of his

sentence. While Patterson testified to the effect that when sentenced, it was provided therein that it would commence to run from the day he was incarcerated, yet such sentence is a public record, and this Court can take judicial notice of it. He was sentenced on September 18, 1950, for a period of three (3) years, and no mention of the time he had been in jail awaiting trial is made.) He further testified that he had never told anyone—no officer of the law, not even the Solicitor who had him subpoenaed, sworn and placed on the witness stand, that he knew anything concerning this case; and that what he was testifying to on the witness stand was the first time he had ever told it. We quote from his testimony:

"Q. You weren't promised a reward of getting out for stating any information? A. No, sir, I wasn't promised any reward at all.

Q. Let me ask you this: what policeman did you discuss this case with before you came up here to testify? A. I ain't seen no policeman.

Q. You never have seen—A. No more than on the city streets.

Q. You never have discussed this case with anybody? A. Never did discuss it with nobody.

Q. You mean to say that you never discussed this case with anybody? A. The only talking I did is what you hear me talk right now.

Q. The Solicitor had no idea what you were going to say until you got on that stand, is that right? A. That's right."

Either (soon) after Patterson was placed in jail, or when he commenced to serve his sentence, and in the Charleston County jail, he was assigned to special duty, part time turnkey and night cook, and was acting in that capacity when the defendants in this case were arrested and placed in the jail. They were brought there at different times in the early part of March, and this witness claimed to remember the order in which they were brought and lodged in jail, and various

other details. But chiefly, his testimony was as to what he alleged he heard these appellants and Failey and Richardson say in arguments, in fights and in conversations between them while they were in jail following the day they had been given a preliminary hearing before a Charleston County Magistrate, who was of course, only passing upon whether there was probable cause for holding them in connection with the crime which had been committed.

With the foregoing background, we will now go into Patterson's testimony—the testimony on which hinges whether the trial Judge was in error in refusing to direct a verdict of not guilty as to Short and Brock, the appellants being discussed. He testified that he had his attention directed to the defendants when they were in a "top side" cell together, with the exception of Richardson, who was in a separate, but adjoining cage, and were "fighting and raising sand and discussing among themselves"; that he went up there to learn what the trouble was, and when he got up there near the cell they were talking about who killed Mr. Wilhelm; that "Little and Failey was discussing and fighting about who done it and who didn't do it." We now quote from Patterson's testimony:

"Q. Did Short or Brock have anything to say? A. He tell them to hush their mouths, because everybody would know what they did. Then Short, he tells them all, says, 'I ain't done nothing,' says 'My daddy will get a lawyer and get us all out.'

Q. Short said what? A. Short said 'My daddy can get us a lawyer, hush your mouth before they all know what we did, my daddy can get us a lawyer and get us out.'

Q. That's what Short said? A. Yes, sir.

Q. Did Brock have anything to say? A. Brock tell them to hush their noise before everybody know what they did.

Q. Did they have any other discussion? A. Yes, sir, they did.

Q. What was that? A. Little, he said—

The Court: Who said? A. Little. Little, he said 'Man, you all got seventeen dollars.' The other boys said, 'No, it wasn't but thirteen—' "

"By the Solicitor:

Q. What other boys? A. The other three said it wasn't but thirteen. Then he made the remark again 'I know it was seventeen,' and the others said 'No, it wasn't but thirteen.'

Q. Did they say where they got the money from? A. Yes, they got it out the man's pouch.

The Court: Who said so? A. Little, he was telling me and two or three others that he got it out of the pouch.

"By the Solicitor:

"Q. Got it out of the pouch? A. Yes, sir.

Q. Did they have any other discussion? A. Yes, sir, Little, he had a discussion over the whole entire field.

Q. What did he say when you were up there? A. When I was up there, he was talking about he hit Mr. Willam with the stick, and how they ganged him and throwed him overboard.

Q. On the occasion that you heard the noise and went upstairs, do you remember how many days that was after they went to Magistrate Herron's Court? A. That was just about two or probably three days.

Q. Two or probably three days? A. Yes, sir.

Q. Who said that there was only thirteen dollars? A. That was Short said there was only thirteen. Little said it was seventeen.

Q. What did Brock say? A. Brock, he say hush their noise before everybody know what they did."

And again we quote from Patterson's testimony:

"Q. Did you hear any other discussion later by these defendants? A. Yes, sir, twice more, I heard a discussion between them.

Q. When was that? How long after the first one? A. Well, that was probably about two weeks—probably, I be-

lieve around the 8th, or a little better up in March, after that had happened.

Q. And what was the nature of that discussion? A. That was a fight between the smaller boys. That was Little and Failey and another little fellow. They kept fighting.

Q. Who was the other little fellow? A. The other little fellow was named Monroe.

Q. Monroe Richardson? A. Richardson is right.

Q. What occurred on that occasion? A. I had to separate them. Had to separate Monroe from Little and Failey.

Q. Were they together after that? A. Afterwards, they were not in the same compartment, but we did put them together later.

Q. Did you hear a discussion? A. I heard the discussion.

Q. Well, what were they talking about? A. They were talking concerning how much money was taken.

Q. What did they say? A. Well, they kept on bringing up about who hit him with the stick. Little he hit him with the stick. 'All right, when you say you hit him with the stick, you say there ought to have been seventeen dollars there, all that money,' and the remaining three fellows—four fellows said 'No, there weren't but thirteen.'

Q. Do you recollect any other discussion in connection with the death of Mr. Wilhelm between these defendants? A. I do.

Q. What was that? A. The three small fellows, which would be Little, Monroe and Failey. They were discussing about they ought to done got plenty money, they left the radios, which they could have got plenty money, on the truck.

"Mr. Santos: Your Honor, I would like to get that clarified; Who is 'they'?

Q. Who had the discussion about the radios? A. Little and Failey was discussing about the radios. Little told Failey, 'We ought to got them radios off that truck.' Failey said, 'No, man, we done the right thing because if we had got them, they would have knowed we got it.'

Q. Were Short and Brock present when they were talking about the radios? A. They were setting over from them on a G. I. can.

Q. Did you say anything? A. Right at that particular time, Brock he told the remaining three fellows—

Q. Who were the remaining three fellows? A. He told Little and Short—no, he told Little, Failey, Monroe and Short—that was four fellows—he told them to 'You all hush your mouth before everybody know our business, what we done.' That was the second time he told them that.

Q. That was about the 8th of March? A. About the 8th of March. Probably could have been the 9th. I don't know the exact date for the time being.

Q. How many days after they had been to Judge Herron's Court? A. It been just about three days, or probably four. I would be afraid to say."

It will be noted that Patterson testified that the first conversation he heard between the defendants occurred two or three days after the defendants had been before the Magistrate, and that the other two conversations overheard by him occurred about two weeks after the defendants had been taken before the Magistrate, and yet he contradicts himself by also saying these conversations (the second and third) occurred three or four days after the hearing before the Magistrate. It will further be noted that in the first conversation, this witness had Short telling Little and Failey "to hush their mouths, because everybody would know what *they* did," and in almost the same breath stating, "I ain't done nothing"; and immediately thereafter, in quoting what Short said, changed the word "they" to "we", so that it reads, "hush your mouth before they all know what *we* did." And then this witness has Brock saying or telling Little and Failey, "to hush their noise before everybody know what *they* did." Again, when Little and Failey were discussing the radios in the truck which had been driven by the deceased, this witness attributes to Brock the following statement: "You all hush your mouth before everybody know

*our* business, what *we* done." (Emphasis added in above quotations.) It is further noticed that all fights and disturbances while these defendants were in the jail as between them were confined to Little and Failey and between the last two named and Monroe Richardson, and in relating what he had heard of the discussion between Little and Failey concerning the radios, he placed Short and Brock as sitting separate and apart from the others, "over from them on a G. I. can." The witness testified that on three different occasions he heard Little, Failey and Richardson fighting, but not one time did he testify that Short or Brock engaged therein.

The appellants, Short and Brock (the ones now under discussion), at all times denied any knowledge of or participation in the murder of the deceased; and Short testified that while all of the defendants were being driven to the Magistrate's office in one automobile by officers and West and Johnson, "I (he) told them boys 'Please don't lie on me,' and Mr. West said 'Shut up your damn mouth.'" There was no denial of this by said officers.

Brock was arrested and placed in jail on March 3rd on a charge of disorderly conduct, but on March 5th this charge was changed to murder. On March 5th at about 6:30 A. M., he was called out of the cell by a County policeman, a Mr. Johnson, and into a small room in back of the main office as one enters the jail, and questioned about the murder, at which time this appellant denied any knowledge of the murder of the deceased. At that time and in this small room, were the appellant, Little and police officers West and Limehouse. Either Johnson or West or both asked Little if Brock knew anything about the death of Mr. Wilhelm, and he first answered "No," whereupon West drew back his hand as though he was going to strike him, and then Little told him, "Yes, I was there." Then West hit this appellant (Brock) in the stomach and Johnson hit him in the head, and the appellant ran out of the small room into the front office in which was Chief Jailer, Wise. At that time officer West

said, "Let that so and so go, I don't believe he know nothing," and Brock went back in the cell from where he was called.

Every statement contained in the foregoing paragraph is taken from the testimony of Brock when he testified at the trial in his own behalf, and is reported more or less in detail for the reason that there is no denial thereof by said officers Johnson and West, or by officer Limehouse, who was used as a rebuttal witness in reference to another matter.

The statements of Little and Failey incriminating Brock and Short made in their presence, when all of them were under arrest and with the officers present, was no evidence against Brock or Short even if they had not denied the truth thereof; and if Little and Failey had freely and voluntarily made such statements. *State v. Evans,* 202 S. C. 463, 25 S. E. (2d) 492; *State v. Hester,* 137 S. C. 145, 134 S. E. 885.

The same law applies to the statements of Little and Failey made in the presence of Short when he was called to the small room back of the main office of the jail, where officers West, Johnson and Limehouse had Little and Failey on the morning all of the defendants were carried before the Magistrate. We quote from Short's testimony as to what occurred in this small room.

"Q. Did anybody say anything to you? A. After Mr. Johnson got at me he told me that 'I was on the beat for six years and this is the first time I ever had to hit you, so all I want you to do is tell the truth.' So I say 'I'm telling you the truth,' and he say 'If you telling the truth, stick by the truth.' So Mr. West, he say "You black son of a bitch,' say 'I ain't forgit ten years ago, when you and my brother had that fight and you cut him.' Say 'I go see that you git the chair or life, and if you don't git the chair or life, I'll git even with you myself.'

Q. Mr. West said that. A. Yes, sir. Then he looked 'round to James Little, and ask James Little, say 'Does this

boy hang out with you all,' James Little say 'No.' and he drawed back and say 'sure, this boy hang out with you all!' and James Little say 'Yeah.' So they send us back to the cell. They lock us back in the cell until eight-thirty or sumpin' to nine. They come back down there and they got me, Leon Brock, Theodore Failey, James Little and Richardson—"

As in referene to Brock's testimony, these officers were not placed on the witness stand to deny the foregoing quoted testimony of Short.

While of course all of the counsel engaged in the trial of the case, including the Solicitor, knew that the witness Patterson was making a false statement when he testified that he had never told to the Solicitor or *any one else* what he alleges he heard in the arguments and conversations between all of the defendants while he and they were in the jail, and that the first time he had ever told it was on the witness stand he then occupied, yet the jury didn't know it. And the same is true of his testimony when he testified to the effect that no one assisted him in being discharged from the jail and placed on parole at the time he was paroled. We will advert to the foregoing later herein.

The writer is also not too impressed with the testimony of the reply witnesses, Garfinkle, the mattress man, and his employee, Bent, especially the testimony of the former. We don't like all of those "befores" in his answers to direct questions by the Solicitor. And how did the appellant Brock know about the delivery of a mattress to Miller's Drug Store on the Remount Road during the latter part of February, 1951?

In passing upon the motions for the direction of a verdict of not guilty, the trial Judge was compelled to view the testimony in the light most favorable to the prosecution, keeping in mind that the defendants were entitled to the benefit of any reasonable doubt thereabout. *State v. Robinson,* 223 S. C. 314, 75 S. E. (2d) 465.

In *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121, 122, it is stated:

"Where it is undertaken by the prosecution in a criminal case to prove the guilt of the accused by circumstantial evidence, not only must the circumstances be proven, but they must point conclusively—that is, to a moral certainty—to the guilt of the accused; they must be wholly and in every particular perfectly consistent with each other, and they must further be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused. (Citing authorities.)

"Every circumstance which is relied upon by respondent as material must be brought to the test of strict proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral certainty that the appellant * * * committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the doctrine of chances that the fact charged is likely to be true."

The *Kimbrell case* has been consistently followed by this Court.

The prosecution relies upon circumstantial evidence, and the testimony of Patterson on which to sustain the conviction of Short and Brock, admitting as aforesaid, that except for Patterson's testimony, there was insufficient evidence to require the trial Judge to submit the issue of their guilt to the jury. After studying the record assiduously, and it being so obvious that the testimony of the witness Patterson was

wholly untrustworthy, we feel it our bounden duty to hold that the trial Judge erred in refusing to grant the motion in behalf of these two appellants for the direction of a verdict of not guilty. We reluctantly reach this conclusion, especially as to the appellant Short, against whom there is slightly more circumstantial evidence than Brock, because the probabilities are that both of them had some part in this crime, but that is a far cry from holding that the verdict should be upheld when it is based on the testimony adduced upon the trial of this case, and admissible against them. There is an adage to the effect that it is better that ninety-nine guilty defendants be acquitted than that one not guilty should be adjudged guilty.

We can well understand how the trial Judge, without the benefit of the transcribed testimony and without the time to ponder and analyze same, apart from the testimony against the other defendants, could easily reach the conclusion thereabout which he did. It has taken the writer three weeks studying the record to separate the testimony as to these appellants, and to reach the above conclusion. And likewise, it was next to impossible for the jury to separate the testimony applicable to these two appellants, with the written confessions before them of the appellant Little, and Failey, in each of which these two appellants, Short and Brock, were named as having taken a part in this heinous crime. The probabilities are that the appointed counsel for the appellants argued to the jury all of the weaknesses in the testimony which we have pointed out, and probably many others, yet such arguments were very much weakened and rendered less potent by the trial Judge telling the jury near the conclusion of his charge that the appointed attorneys for the defendants, "in their zealousness to represent their clients' interests are naturally biased in favor of their side."

We now come to the appellant Little. This appellant made both oral and written confessions that he with others named by him (two of whom, as hereinbefore stated, are now serving life sentences in the State Penitentiary) committed an

assault and battery upon the deceased, robbed him and then pushed him into a creek, where he drowned. In addition to the confessions, Little accompanied the officers of the law to the site where the robbery and murder occurred, and pointed out various things to them, among which was where the deceased had parked the truck he had been driving. The trial Judge was careful in protecting all rights of this appellant before admitting the confessions in evidence. Notwithstanding these confessions, the appellant repudiated them on the witness stand, and claimed that the written confession was filled in or typed after his name had been placed thereon in type print, and after the officers had signed as witnesses thereto; and further, that he could neither read nor write. However, he did speak of a white paper that "didn't had no writing on it before, when I signed it." Immediately following this, we quote from Little's testimony:

"Q. Well, go on. A. So I put my name on the paper.

Q. How did you put your name on the paper? A. I spell it.

Q. All right. A. So, after I got through settin', well, Mr. West, he signed his name, and the chief signed his name. Well, they took the paper and give it to this lady—she was the chief's secretary, and she was typing it, but I don't know what she put on it. * * *"

He further testified that he was forced to sign the confession, and that when he started to tell Mr. Herron, the Magistrate, about it, officer West shook his head at him and said "No," and he was afraid to do so.

Whether the appellant Little was forced to sign the written confession and make the oral confession testified to by the officers, and otherwise incriminate himself, was an issue for the jury, and the trial Judge could not, in the light thereof, have lawfully granted the motions for a direction of verdict of not guilty as to this appellant. Without considering the testimony of Patterson, or that portion of the testimony of Mrs. Lovey Mae Smith which was given in the presence of the jury, there was ample testimony to support the ver-

dict of guilty as to Little, if the jury reached the conclusion that his confessions were freely and voluntarily made. It would be a work of supererogation to go further into the testimony against Little.

Of course, the statement of the trial Judge in his charge to the jury that the attorneys for appellants were "naturally biased in their side" had no place in his charge, but we cannot say, in the light of this appellant's confessions, that it could have had any effect on the jury. In other words, as to this appellant, the jury could not have honestly done otherwise than render a verdict of guilty.

The slight unintentional deviation from the order of the trial Judge in the sequestration of the prosecution's witnesses when one witness for the State returned to the room where the State's other witnesses were sequestered, did not require him to order a mistrial. We think he was justified in refusing the motion for a mistrial.

It appears to us that appellant's Question 5, as to the instruction of the trial Judge to the jury that "any statement made by one defendant about other defendants is not binding on anybody except himself, unless that witness was on the stand," could not have been prejudicial to appellant in that no defendant in this case who testified undertook to involve this appellant; and the appellant proclaimed his innocence when he testified in his own behalf. We agree with appellant's counsel that "binding" was not a good choice of words, but in this instance, the appellant now under discussion could not have been thereby prejudiced.

Before concluding this opinion, we desire to commend and thank the counsel who, by appointment of the Court, gave so freely and ably of their time and talent in defense of the defendants. And we further commend and thank the counsel who perfected this appeal, and has at his own expense filed a printed transcript of record supplemental to the typewritten testimony taken at the trial, and an excellent printed brief, all of which was in addition to appearing before this Court and orally arguing the appeal.

Should be reversed as to the appellants, Short and Brock, and affirmed as to the appellant, Little.

TAYLOR, J., concurs.