16362

STATE v. WILKINS

(59 S. E. (2d) 853)

*Messrs. Sam N. Burts* and *Arthur D. Rich,* of Spartan-bury, *and H. R. Swink,* of Gaffney, *for Appellant,*

*Mr. Sam R. Watt, Solicitor,* of Spartanburg, *for Respond-ent.*

May 25, 1950.

BAKER, CHIEF JUSTICE.

The appellant, Mandret Wilkins, was indicted on two counts: First, Assault with intent to Ravish, and second, Assault and Battery of a high and aggravated nature. The case came to trial at the November, 1949, term of the Court of General Sessions for Cherokee County, on both counts. The jury returned a verdict of guilty of Assault with intent to Ravish (and evidently recommended mercy), and the trial Judge sentenced the appellant to fifteen years in the State Penitentiary, or on the public works of Cherokee County. Prior to the pronouncement of sentence, the appellant made a motion for a new trial, which motion was refused.

The appellant contends, (1) that the evidence against him being circumstantial, it fails to meet the requirements; (2) that there was no overt act indicating an intent to ravish, and therefore the first count in the indictment should not have been submitted to the jury; and (3) that the trial Judge erred in refusing the appellant's motion for a mistrial because of the alleged comment by the Solicitor on the failure of the appellant to testify.

Of course, if the record supports any one of the above exceptions or issues, it would be the duty of this Court to at least grant the appellant a new trial.

The prosecutrix was a trained nurse employed by Cherokee County Hospital, and lived in the Nurses' Home provided by the hospital. This home is located on one of the main streets of the City of Gaffney, near the Cherokee County Courthouse, is a two-story building, and was occupied by eight nurses. The prosecutrix shared an upstairs room with one of the other nurses, who occupied a separate bed in this room at the time of the assault.

On the night of the assault (August 2, 1949) the prosecutrix worked until 11 o'clock, came to the Nurses' Home at about 11:30, and shortly thereafter, she and her roommate retired to their respective beds. About 2 o'clock, the prosecutrix woke up. She looked over towards the door to the room

and saw a man standing in the doorway. She did not move at first, but when she raised her head, the man started coming to the bed. He caught her around the neck with his hands, his thumbs being to the back of her neck, he placing himself to her back and not facing her. She commenced to scream and when her roommate waked up she and the man were between the two beds, in a standing position, with his hands still around her neck. When her roommate jumped up, this man turned her loose and ran. The prosecutrix saw one side of his face, and recognized that he was a negro. Soon after this man ran down the stairs, a shoe heel from a man's shoe was discovered on the stairs, and left there until after the arrival of officers of the law. The officers picked up the shoe heel which was the only clue at that time as to who had entered the house and committed the assault (and battery) upon the prosecutrix.

For some reason not disclosed by the record, a policeman in the City of Gaffney went to a building in Gaffney known as the Blue Room, in the rear of which building the appellant rented a room, and in this room found a pair of shoes with the heels missing from them. The appellant was there at the time and admitted to the officer that he owned the shoes, and when asked what became of the "heel," replied that he tore "them" off and threw "them" in the branch. A shoemaker (shoe repairer) with twenty-two years of experience, testified without equivocation, that the shoe heel identified as the one picked up from the stairs in the Nurses' Home came off of one of the shoes which had been taken from the appellant's room, and as aforesaid, there is testimony that the appellant admitted the ownership of those shoes. The testimony of this witness is of such importance that we feel justified in reporting it practically in full, and in question and answer form.

"Direct Examination.

"Q. What are these? A. Heel and shoe; had renewal heels on them. (Takes shoe in left hand and heel in right.)

"Q. Can you tell me where that heel came from? A. Came off this shoe. The heel was put on at a shoe-shop; he ground the base also with the heel. Left a ridge both on the heel and the base; sand them off, makes a much better job.

"Cross-Examination.

"Q. This heel could have come off some other shoe that had been cut down like this? A. I would not think so, sanded like it is.

"Q. This heel could come off another shoe; you are not swearing it came particularly and certainly off this shoe? A. I am swearing it came off that shoe. It has been put on that shoe and sanded down to that base could not be otherwise and leave them marks on it.

"Q. Do you know whose shoe it is? A. I can't tell you nothing about that.

"Q. That the heel came off that shoe, that is just your opinion? A. I know it; the marks are there to show it; just like putting up two pieces of lumber at an angle.

"Q. That is your opinion? You don't know whether it came off another shoe, or not? A. Would not have been made to fit just like this, sanded clear across like it is. This heel remained on the shoe from the time it was put on there until it was knocked or scraped off; that heel has been put on in a shoe-shop; holes show it was nailed to that shoe; it has been nailed to that shoe.

"Q. You don't know whether it was on this shoe, and then off, and then put on another shoe, do you? A. It has been sanded; none of them fits when you put them on.

"Q. A lot of people put them on at home; a lot of people find a heel somewhere and put it on a shoe? A. Would not be sanded like that.

"In reply:

"Q. This other shoe had heels on it, too? A. Both have nail-marks. (Shoes and heel placed in evidence.)"

Appellant's first and second exceptions are so intermingled that they will be discussed together.

We are here dealing with a home where there was no male occupant, and one where there is not even conjecture that on or about the time of this assault, any man had entered the second story thereof other than the intruder who committed the assault, and who had gained entrance to the home by breaking in through a window. With such in mind, and in the light of the testimony, some of it summarized, and some set out in full above, we have no hesitancy in holding that the trial Judge was fully justified in submitting to the jury whether the appellant was the one who had entered the home on this occasion, and the jury was likewise justified in answering such issue in the affirmative. It is argued by counsel for the appellant that there is nothing in the record to show that he intended to ravish the prosecutrix, if it was he that was there; that he may have had the intent to commit burglary; that he may have been a "peeping Tom"; he may have wanted to frighten the sleeping women; that it is as logical to infer any of these as it is to infer the worse. But such argument overlooks the fact that appellant did not know that the prosecutrix was not alone in the room; that when he became aware of the fact that his presence in the doorway was discovered instead of retreating and getting out of the house, he advanced on the prosecutrix, grabbed her from her back so that she could not recognize him thereafter, and was struggling with her up until the time the roommate of the prosecutrix jumped from her bed, and it was then only that he ran. If his intent had been, in entering this home, the commission of any crime other than the one of which he was convicted, or if at the time he advanced on the prosecutrix when she raised up in bed and caught her throat in his hands his actions indicated any other intent, it would indeed be impossible to say as a matter of law to what limit a would-be rapist would have to go before an overt act has been committed sufficient to warrant a conviction for assault with intent to ravish.

The testimony in this case presented an issue as to the intent of the appellant upon which the jury should decide, taking into consideration all of the circumstances; and in our opinion it was sufficient to support the verdict rendered.

We adhere to the rule as to circumstantial evidence as laid down in *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121, and subsequent cases. The holding in this case in nowise conflicts therewith.

The defendant-appellant offered no testimony. In the argument of the Solicitor to the jury, he stated: "Rapists and robbers, and burglars and killers, and those bent upon those kinds of crimes don't operate that way. They don't send out word 'I am going to enter the kitchen window of the Nurses' Home'. Talk about officers and buck-passing—they want to pass the buck to you—We pass the buck to no one; we have brought you the evidence, evidence that cannot be and is not disputed  *  *  *".

At this point the Solicitor was interrupted in his argument, the jury excluded, and a motion made by appellant for a mistrial on the ground that the Solicitor had thereby commented on the fact that the defendant-appellant did not take the stand to testify and deny any of the testimony adduced by the State.

In refusing the motion for a mistrial, the trial Judge stated in part: "I may have put a different interpretation on the remarks. The Solicitor was looking and more or less indicating the shoe there. I followed the argument, and it did not cross my mind at the time. That part had not entered my mind.  *  *  *  That is one inference that could be put on it. I don't think I would be justified in saying that is the only inference, the sole inference. * * *"

We agree with the trial Judge that the remarks of the Solicitor were close to the border line, and that it was possible to draw the inference that he could have been referring to the fact that the defendant-appellant did not go upon the

witness stand in his own behalf, but we seriously doubt if such inference registered in the minds of the jury. If such inference was conveyed to the mind of any one or more of the jurors, the trial Judge off-set same by charging them as follows: "The defendant in this case has offered no testimony in his behalf. That is his prerogative, and it is not a circumstance that you can take into your consideration, or even allow to enter into your discussions in your jury-room. Under the Constitution of South Carolina, and under the Constitution of the United States, it is his prerogative to go forward, or to remain silent, and the burden of proof is upon the State of South Carolina to establish his guilt by competent testimony beyond a reasonable doubt." Of course if the Solicitor had, in his argument, directly referred to the fact that the appellant did not go upon the witness stand, it would have been the duty of the trial Judge to declare a mistrial when such was brought to his attention.

As stated by the trial Judge, if the appellant was in this home under the circumstances as disclosed by the testimony, he would have been guilty of burglary under any other theory of his intent, and he was sentenced in accord with the sentence which would have been imposed for burglary (if mercy had been recommended).

All exceptions are overruled, and judgment affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.