16370

### STATE v. RAMEY

(60 S. E. (2d) 66)

*Messrs. Nicholson & Nicholson,* of Greenwood, and *Mars & Mars,* of Abbeville, and *C. T. Graydon,* of Columbia, *for*

*Appellant,*

*Messrs. Hugh Beasley, Solicitor, of* Greenwood, and *Ralph J. Syfan, of* Abbeville, *for Respondent,* cite:

June 14, 1950.

GASTON, Acting Associate Justice.

The appellant states that the questions involved in this appeal are:

I. Did the trial Judge err in refusing to direct a verdict for the appellant on the grounds that there was no competent evidence circumstantial or otherwise to establish that the appellant was guilty of murder or any lesser crime? (Exceptions 1, 3, 4, 5, 7, 8, and 9.)

II. Did the trial Judge commit prejudicial error in refusing to dismiss the defendant as an accessory before the fact? (Exceptions 2 and 6.)

We are called upon to review the evidence in this case. The only issue arising on appeal is that there was no competent evidence, circumstantial or otherwise, to convict the appellant of manslaughter, and that the Court erred in refusing to direct a verdict of not guilty. She and her son by a former marriage were tried together on the charge of the murder of her husband. Both were convicted of manslaugh-

ter. She alone appeals. She was also charged in the indictment as being an accessory before the fact and as accessory after the fact. The charge of accessory after the fact was dismissed by the trial Judge. No verdict was found against her on the count of accessory before the fact. Appellant also claims that it was prejudicial error to submit the issue of accessory before the fact to the jury. By the verdict, she was acquitted in law of the alternative offense of an accessory before the fact. This eliminates the theory that she was absent when the crime was committed. The verdict of manslaughter as to her is a finding by the jury that she was present and participated in the crime as a principal.

The record is voluminous. There are some seventeen photographs of the exterior of the residence and of certain portions of the interior where the killing took place, with a floor plan or diagram of the inside.

On the evening of the fateful night the defendant and her son, who was twenty-five years old, were engaged in riding by automobile for several hours with no apparent purpose. They started at about 5:00 o'clock on the afternoon of December 27, 1948, from the Abbeville Cotton Mill, drove around the City for some time, then stopped at "The Rock" where they picked up Dot Hammond, a sixteen year old girl, and her male companion. They next drove to Greenwood where they visited appellant's sister and her husband, then they went by "The Fairway" near the city limits of Greenwood and returned to Abbeville after 11:00 o'clock that night. We shall not put undue stress on this ride.

At about 20 minutes to twelve o'clock at night, the defendant, Eunice D. Ramey, was first seen by the witness for the State in the road flagging him down with a flashlight. She seemed to be upset and worried. This witness, on his way to work, stopped his car and asked her what was wrong. She repeatedly said, "My husband has shot himself, please, please get an ambulance." She did not have all of her clothes on; her hair was all torn up; she was barefooted. She re-

plied to the inquiry, who is your husband and where do you live? "Ramey." "You just go up and tell Mr. Harrison to bring the ambulance, he knows us and where we live, go on, please, please." This witness, C. C. Simmons, was in his car with his wife and niece on their way to work. They did not stop at the ambulance place but reported to the policemen, and they went on to the mill to work. It was ten minutes to twelve when they got to the mill by the mill clock.

The officers of the law reached the scene very soon after this report. They found Mrs. Ramey out in the road, between the highway and their home. The officers stopped, picked her up in their car and went on down to the house. "She was talking and going on and kind of crying." She apparently was drinking. She first said, "Dit (her husband) shot himself." "Lord have mercy, Sing, Dit shot himself. What in the world will I do." The officers then went with her into the house. On going into the house, she said, "Is he dead, do something, you all do something."

Ramey himself was found in the little bedroom lying on his left side beside the bed, pretty close to the bed. A pistol was lying near his feet. His head was from the door. Ramey was conscious and said to the officers, "Dickey shot me and took off." The officer went into the room where Mrs. Eunice Ramey was and said, "Mrs. Ramey, Dit says that Dickey shot him." She replied "Oh no, no, Sing, no, he didn't, he does not know what he is saying."

The ambulance arrived. Dickey also showed up and appeared to be drinking and said to the officers, "Do something, goddammit, do something." Again Ramey said as he was being put in the ambulance, "Dickey shot me. Watch him, he's got a gun."

The officers were first going on the theory that he shot himself because of Mrs. Ramey's statements and they tried to comfort or console her.

The pistol had two empty shells, the others were loaded. The voluntary statements by the appellant to the officers so

soon after the tragedy that he shot himself may well have been taken by the jury as dispelled by the accusations by Ramey himself that Dickey shot him and made off. Also it could hardly be true that Ramey would shoot twice either accidentally or intentionally to injure or kill himself. Even in a struggle this was unreasonable. Evidently the jury believed that he did not shoot himself. Mrs. Ramey that night insisted that he did not know what he was saying. Either she was shielding herself or her son. Her excitement did not render her incapable of seeing and knowing what went on in her own home, alone with her husband and her son, at the well-nigh midnight hour. Ramey thought Dickey went off with the pistol. Dickey says he left Ramey being supported by Mrs. Ramey. No doubt the jury believed that the pistol near Ramey's feet was mute evidence that it was placed there after Ramey fell, at which time only Mrs. Ramey was present. The evidence as to the place and condition of the pistol is an established fact. There was only the one pistol in the hands of the defendants. Mrs. Ramey told the officer, "That's the only one." She knew that Dickey had not made off with it. There it was with two bullets gone and two empty shells in the chambers lying under the ankle near the feet of the helpless, wounded man, whose only relief was a pillow under his head.

The Sheriff came into the house that night shortly after Ramey had been taken to the hospital. No blood was on the floor nor on the linoleum rug where Ramey had been lying when the officers arrived. Mrs. Ramey told the Sheriff that Ramey did not bleed after he was shot which the Sheriff told her was strange as he was shot through the body from one part to the other. Her statement at least shows that she was alert and well aware of what went on before the arrival of anyone while she and Davis were the only ones present in the house with Ramey. She also told the Sheriff that night that she "supposed Ramey shot himself for he was lying on the floor shot when we got there",

when she got home. This statement was repeated several times when the Sheriff first talked to her at the hospital that night. She said he shot himself because he was lying on the floor shot when we got home. Her concealment of the facts was self-evident. No bullet holes were found by the Sheriff in his search of the floor, walls, and ceiling of the bedroom where Ramey had been lying. The Sheriff next talked at the hospital that night to Ramey who was in a normal state of mind. As the result of this the Sheriff next morning located a spent bullet in the baseboard near the radio in the living room. He also talked again to Mrs. Ramey in regard to more than one shot and whether she fired one. At first she said, "No, I did not fire any shot". The Sheriff then asked her about going to the house with him and his deputy to look over the house. The she said, "By the way, I did fire one shot", but that she fired up into the ceiling. At the house she was asked about the radio to which she said, "We don't happen to have a radio in here". The Sheriff said, "You mean you have no radio at all'. She hesitated and replied, "We have one up in the farm room," and pointed to the front of the house. While she was with the Sheriff in the house, he made a complete thorough examination of the house and furniture. He found only the two places, the bullet in the baseboard near a chair and radio in the front room and the bullet hole in the window shade and glass in the bedroom, when Mrs. Ramey pointed to the shade and asked, "Could that be the bullet hole in that window shade?" The Sheriff asked her if she fired that shot. She first said "I shot down," then said, "I believe I shot up." The Deputy Sheriff Cann went to the house with Sheriff Fleming, Mrs. Ramey and her mother on the occasion related above. The Deputy testified that she kept saying that Dit Ramey was not well, that she tried to get him to go to see a doctor and she made it appear to Mr. Cann that he took his own life. He asked her how many shots were fired to which she said one. He asked her if she had her hands on the pistol, to

which she replied, "Since you mention it, I believe I did."
She said, "I was going to kill myself and I shot the pistol
to see if it would shoot." It was then that she was asked
to go to the house from the hospital to show where it was
that she shot the pistol. She took them to the hall by the
bathroom and showed where she was standing, that was in
front of the bathroom. The Sheriff placed her under arrest
after this investigation while she was there in the house.
She had a pair of knucks in her handbag which she was
carrying. A few days later Deputy Cann went with Mrs.
Ramey and her attorney into the house to see a little clasp
that holds the catch of the lock which had been knocked
out and was in the bathroom on the floor; although Cann
testified it was not there when he first looked for the bullet
hole. This occurred after the defendants were released on
bail. The latch had been torn off the bathroom door since
the first inspection by the officers; the wooden part of the
door facing showed that a chisel had been used; a chisel and
little file were upon the bathroom floor at the time of the
last inspection; the photograph in evidence also showed this.
No furniture showed any evidence of a struggle between
the husband and Davis; the house was not large; it had
articles of furniture which were not upset. In the living room
where the bullet was lodged in the baseboard there were a
red over-stuffed chair, a lounge in the middle of the room;
several other chairs; the radio, and a chair by the radio
near the fireplace. Davis says that he and Ramey were sitting
in the living room and that Ramey was in the chair near
the radio when the first shot was fired by Mrs. Ramey near
the bathroom. He claimed that he and Ramey went to the
bathroom to take the pistol from her; that he and Ramey
struggled over the pistol because Ramey was going to shoot
his wife. There was noting to indicate a struggle had taken
place. The ever ready pistol was in Mrs. Ramey's hands
when the first shot was fired. She got it from a drawer near
the bed where she and her husband slept.

There were no powder burns on the body or the shirt of the deceased, yet the type of cartridge that killed Ramey will make a powder burn at a distance of from one-fourth of an inch to twenty inches from the muzzle of the revolver. It was a 32-20 cartridge loaded with progressive burning powder which the State proved would make a powder burn plainly visible for the distances mentioned. The evidence negatived all suggestion or claim that Ramey's hands were in reach of the pistol; in other words the pistol's muzzle was more than twenty inches from the wound. Davis testified that he and Ramey went from the living room, through the kitchen into a small hall to force open the bathroom door, then struggled from that point over the pistol back into the kitchen, into the living room where he was shot, then that he supported Ramey back again in his wounded helpless condition over the same route to the bedroom where he was left on the floor. Mrs. Ramey claimed that she was on her knees praying while the mortal struggle ensued. There was no evidence to sustain such a claim. No furniture was upset; no blood was found on the floor. The bathroom showed no evidence of a broken door or latch when first seen by the officers.

On the other hand the evidence for the State is that the shot fired by Mrs. Ramey was in almost a direct line as traced by a tight string held through the hole in the outside screen and through the small hole in the window frame to a position in the bedroom door where the deceased was lying with his feet toward the bedroom and his head toward the window when the officers arrived. She was standing in front of the bathroom just outside the bedroom door at the time she fired the shot that she admitted. The course of her bullet was along the path indicated by the string. She was familiar with firearms and under the testimony carried a pistol in her handbag or pocket book on a previous occasion.

After the death of Ramey a search was made of the house for his U. S. Government Bonds and life insurance

policies, but they were missing out of his home and found in the hands of appellant's younger son. Even if the house was locked by the Sheriff, the appellant's son had access to the house to gain possession of these securities; and later the house was entered to remove the catch of the bathroom door, if the testimony for the State is believed by the Jury.

Mrs. Ramey's statements to the officers were quite disingenuous. Her claim that her husband spoke harshly to her that day was not sufficient provocation to kill him, nor was there any sustaining evidence to show that he killed himself, nor to show that he tried to help her kill herself, nor to show that she was attempting to kill herself.

The deceased was an industrious sober man, who was well thought of by his acquaintances; he did not leave home at nights except with his wife on occasional visits to his mother's home so the wife testified. The night of the shooting he had on his work clothes and was seemingly putting tile down with cement in the kitchen to his new home.

He was shot about midnight of December 27th and died on December 29th. On the first night his doctor felt that he might recover. His statements were made to the Sheriff and other officers during the early morning hours of the first night. The officers testified that F. L. Ramey would not say anything about the shooting while his wife was in the room; his statement was made after she was taken into another room at the home before he was taken to the hospital. The Sheriff again talked with him at the hospital. What he may have said to the Sheriff was not admitted in evidence but there is nothing to indicate that he exculpated his wife even if he may not have implicated her. Mrs. Ramey claimed that she was passionately devoted to her husband. She was smarting from his remarks to her at dinner and displayed her excitement during the night ride. The witness Free, her sister's husband, said she was nervous and agitated at their home that night.

The defense adduced the testimony on cross examination of the mother of Ramey that her son asked for his lawyer to come to the hospital to make his will because his business was not like he wanted it, but his condition grew worse and was too serious for him to make the will.

The evidence for the State showed that Mrs. Ramey was concerned about her husband's property. At a family gathering on November 17, 1948, which was the month before his death, Mrs. Ramey, the appellant, spoke disparagingly of her husband and said to one of those present that she had part of his property in her name and was going to get the rest of it in her name because he is always giving his mother money and when she got it in her name she would put a stop to it "if I have to kill him to do it." Also "that if anything should happen to me, my children would not get a cent of it." She said she had her baby in her handbag, that "my baby is my gun. I take it with me all the time." She further said that anybody could have her husband as she had a belly full of him. Her husband's only reply to this was, "Hush, Eunice, you talk too much." This evidence shows that trouble was brewing between herself and her husband which was for the jury to believe from the testimony of the witnesses on the stand. The testimony shows that she and her son were together for several hours preceding the homicide and were together at the time of the shooting. They both fired the pistol. She was first to get the pistol from its usual place in the house. Her son had made threats on the ride that night against the life of the deceased, saying that Ramey did not treat his mother right. She was agitated by reason of what her husband had accused her. She made no protest to her son on the ride and at least knew his frame of mind and attitudes, yet on arriving at home she got the pistol as soon as her husband reiterated his statement that he was done with her.

It was a question of fact for the jury to decide from all of the circumstances whether she and her son were acting in

concert with a common purpose under an indignity to which they both testified as the cause of the beginning of the fatal difficulty by reason of Ramey's statement to her. The shot fired by the appellant was not over three feet from the bedroom. She said from the bedroom to the bathroom might be three feet. She was present in the house all of the time during the difficulty and both men most of the time were in her sight and hearing.

The course of the bullet was shown by the medical testimony; the range of the bullets was shown by the holes in the house. The jury had all of the photographs for their information and guidance. The fatal wound was caused by the 32-20 bullet fired from the four inch barrel Colt revolver. It entered his body at a level of about the fifth rib on the right side of the sternum which is the mid bone of the chest. It entered about eight inches from the top of the shoulder in front and came out to the left of the spinal column about two inches, one or two inches at the left of the tenth rib about ten inches below the top of the shoulder. It coursed slightly downward from above to the back.

Whichever bullet hit him went clear through his body. One bullet lodged in the baseboard to the. living room, a distance of three feet nine inches from the radio. The photo shows a fireplace on one side of the radio and the bullet in the baseboard on the other side. The radio was next to the wall between these points. The room was fifteen feet eight inches wide. There were other articles of furniture in this room such as a chair, table, stool, sideboard, small table, lamp on top of radio, ornaments on the mantel, window, and three doorways, one of which entered the kitchen. The witnesses said none of the things in this room were upset and there was no evidence of a death struggle.

The other bullet hole was in the bedroom where Ramey was found upon the floor, shot through his body. The course of this bullet was in line with the door to the bedroom upward through the pane of glass to the window as shown by

the photos and string. To go from the living room to this bedroom a person would first enter the kitchen, then along a short hallway past the bathroom, into the bedroom. The jury was in a position to determine whether both shots were intended for Ramey; one shot hit him, the other did not.

Mrs. Eunice D. Ramey was a witness in her own behalf. She narrated the account of her married life with her husband for the past eleven years, saying she loved him devotedly, assisted him by working in their business, and that she put her little money in with his when they were first married in 1938, at which time she had two young sons by a former marriage. She and her former husband were divorced, he having since remarried. Ramey's home was in Abbeville where she and her two sons resided as one family, after her marriage to Ramey, who helped support these sons. She testified that on the day of the homicide as usual she got up and took Dickey to his work around quarter to 8:00 o'clock that morning. Her husband was not feeling well and so she went back to bed. Both were late getting up. They both put down some tile that morning in their home which was being newly built. They went to a tenant's house for him to fix a spigot.

She says that during her preparation of dinner as she was putting it on the table, between 3:30 and 4:00 o'clock, "my husband told me he did not love me any more. He said he hadn't since I had a serious operation three years previous and that he knew this operation was caused from venereal disease. He said his mother told him that." She says that she became upset, did not eat any dinner, lay down on her bed until about time to go for Dickey. Her account of the trip and ride differs very little from that to which Dickey testified. She ate a sandwich and drank one beer at The Rock, where Dot Hammond and Diggs Lewis joined them.

Her description of the occurrence on her return is that as she walked into the house, she saw her husband standing there and she said, "Hello Darling". He replied angrily,

"I still mean what I said," which completely upset her as she loved him so much. So she went into the bedroom, just took the gun out of the night stand drawer right at the bed, "and was pranking with it". "So I decided at that point I'd just kill myself", but did not know how the gun would act, so in fooling with it some way a shot was fired, which went up through the upper part of the window. Then she says she ran into the bathroom, gun in her hand, to kill herself. Both men pushed the door open and got the gun away from her, she said. Her husband told her, according to her statement, "If you haven't got the guts to do it, I'll do it for you." The struggle continued between the two men while she "ran to the bedroom, fell on her knees, went to praying, and asked the Lord not to let anything happen to either of them."

She says she heard the shot from the direction of the living room and as she started up there, met her son supporting her husband. Her son left for a doctor, she said. She got as far as she could with Ramey, but for lack of strength let him down on the floor and put a pillow under his head. Her shoes were already off but she ran with a flash light out into the night to the road to stop somebody to get help. A passing car stopped and she asked the occupant to get an ambulance. A car with three policemen arrived first. She fell into the car and asked them to please do something. When the ambulance came he was taken to the hospital and she went in another car right behind it to the hospital but did not get to see him. She says she shot one time in an up direction and showed the Sheriff the next morning where the bullet went.

She denied all statements attributed to her by the State's witnesses about her husband and denied that she said, "Anybody that wants my husband can have him. I have had a belly full of him for a long time." She denied that she said that her bag had her pistol in it, denied that she said her husband had given her $80.00 per month and she had misplaced it, and would have to get it back, if she had to go with every man in Abbeville to get it.

She denied that she said that she had got part of his property in her name and was going to get the rest of it and that when she did get it in her name, she was going to stop him from giving money to his mother if she had to kill him.

She explained that she had a pair of knucks in her pocket book over at the jail, for the reason that her husband thought they belonged to his father and had been in the family for years and were located when they moved in the new house while cleaning out chest drawers. So she put them in her pocket book to ask his mother about them.

On cross examination, Mrs. Eunice D. Ramey, the defendant appellant, said she had only $1,000.00 after her marriage to Ramey which she got from an accident policy on an uncle. She did not have any money when she got married. All that she put in the business was about $900.00 of the uncle's insurance. At the time of Ramey's death she had one house and half of the filling station and a bank account, which had been as high as $4,000.00. Also at his death there were U. S. Government Bonds for around $7,000.00 in her name and/or his. Also he left some insurance of which she is beneficiary. He owned three dwelling houses and a half of the Calvert Oil Company at his death.

She said she could shoot a rifle and could hit anything running with a 410, which is a small bore shotgun utilizing a light charge of powder and shot.

Her explanation is rather weird. The jury was warranted in rejecting her claim that she was seeking self-destruction, which of course is a felony and there is nothing in the testimony to lead to the belief that such was a fact except her own and her son's statements. If indeed she was upset by her husband's remarks, the jury may well have concluded that her purpose in shooting was directed against him and not against her own life. The pistol was found where he was lying upon the floor either put there by design or when it was no longer being used.

The credibility of the testimony was solely for the jury. The facts were all for the jury and the eidence was sufficient to sustain the verdict and excludes every reasonable hypothesis except that of her guilt.

In the recent case of *State v. Hackett,* 215 S. C. 434, 55 S. E. (2d) 696, 702, we said:

"In this case the incriminating evidence taken in its entirety if accepted and believed by the jury, would seem to be sufficient to warrant the verdict. The weight of the evidence and the credibility of the witnesses are matters exclusively in the province of the jury."

"From the manifold forms which circumstantial evidence may assume, it can never be laid down as a matter of law what is sufficient to amount to proof of guilt so as to convict. In cases both of circumstantial and direct evidence, it must be such as to satisfy the jury of the guilt of the accused beyond a reasonable doubt and to a moral certainty. If it reaches that standard, the jury is justified in rendering a verdict of guilty. *State v. Mitchell,* 56 S. C. 524, 35 S. E. 210."

"The two phrases, '(proof) beyond reasonable doubt' and '(proof) to a moral certainty' are synonymous and the legal equivalent of each other. * * * These quoted phrases connote, however, a degree of proof distinguished from an absolute certainty. The reasonable doubt that the law in its mercy gives the benefit of the accused is not a weak or slight doubt, but a serious or strong and well founded doubt as to the truth of the charge. *State v. Bodie,* 33 S. C. 117, 11 S. E. 624."

"In our opinion, the full summary of the incriminating facts is sufficient to excite more than suspicion as to the guilt of the accused."

See also *State v. Wilkins,* S. Car., 59 S. E. (2d) 853.

We concur in the verdict of the jury that the appellant, Eunice D. Ramey, was present in her own home and actively

participated in the felonious and unlawful death of her husband.

Judgment affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.

BAKER, C. J., not participating.