17059

THE STATE, Respondent, v. MARVIN H. CHASTEEN, Appellant
(88 S. E. (2d) 880)

*Messrs. Frank E. Harrison,* of McCormick, and *Felix L. Finley, Jr.,* of Pickens, *for Appellant,*

Hubert E. Long, Esq., Solicitor, of Leesville, for Respondent,

August 24, 1955.

OXNER, Justice.

Upon an indictment charging him with the murder of Roy Wiggins on November 5, 1953, appellant was tried at the June, 1954, term of the Court of General Sessions of McCormick County. He was found guilty and sentenced to death by electrocution.

By the first two exceptions appellant challenges the sufficiency of the evidence to sustain the verdict. This question was timely raised in the Court below by a motion for a directed verdict and for a new trial.

The deceased and his family lived near Easley, South Carolina. His wife, Rose Wiggins, worked in the weave room of the Glenwood Cotton Mill. Appellant worked in the same room. He and Mrs. Wiggins operated adjoining looms.

Around noon on November 10, 1953, two Negroes, who had been directed by their employer to cut some wood, found the body of the deceased near a sawdust pile in a rural

section of McCormick County, about five miles from the town of McCormick. They notified the Sheriff who went immediately to the scene. According to this officer, deceased was lying in the woods on his stomach with his hands folded under him. There was considerable blood under his head but none on his clothing. He was neatly dressed. There were beggar lice on his trousers. The body was removed to an undertaking establishment where that night it was examined by a physician. He found two bullet wounds in the head. One entered on the left side behind the ear, passed through the brain and lodged over the right eye. The other entered just behind the forehead, passed through the brain and lodged at the back of the head. According to this physician, either wound was sufficient to have caused death. It was his opinion that the deceased had been dead at least two or three days before he was found. The bullets were removed from the head and delivered to a ballistic expert of the South Carolina Law Enforcement Division, who was present when the autopsy was performed.

A son-in-law of appellant testified that one night (he was unable to recall the date) appellant came to his home and borrowed a rifle, stating that he wanted to go squirrel hunting. He returned it the next afternoon, saying that he went hunting but did not kill anything. During the investigation of the homicide, the officers came to the home of this witness, seized the rifle and turned it over to the ballistics expert. Later this expert fired several bullets from the rifle and compared them under a microscope with those removed from the head of deceased. He was quite positive that all of the bullets came from the same rifle.

On November 11, 1953, the day following the discovery of the deceased's body, several members of the State Constabulary, along with a number of local officers, started an intensive investigation. Early Monday night, November 16th, they took appellant from his home at Easley to the Sheriff's office at Pickens, where he was questioned for several hours. Shortly before eleven o'clock he was released

so as to enable him to go to work on the third shift in the mill that night. He promised to be back in Pickens at eleven o'clock the following morning. He failed to meet this engagement. It developed that he had disappeared.

About 8:30 on Monday morning, November 23rd, the Sheriff of Pickens County was called over the telephone by a Mr. Ellis, an Easley minister, and informed that appellant was there and desired to surrender. As a result of this conversation, Ellis took appellant to Pickens and delivered him to the Sheriff. According to the officers, appellant seemed tired and worried and said that he had been to Mexico and had lost a lot of sleep. His first statement with reference to the homicide was made about nine or ten o'clock that morning at Pickens, when he said that Mrs. Wiggins met him on a highway with the body of the deceased in the trunk of her car, which was then placed in the trunk of his car and taken by them to Mc-Cormick County. Shortly thereafter the officers proceeded with appellant to McCormick. En route he remarked that he had not told the truth. He then said that he and Mrs. Wiggins went to Greenville on the morning of November 5th and picked up the deceased, telling him that they were going squirrel hunting, after which the three of them drove to McCormick County, where Mrs. Wiggins shot her husband. After making this statement, the officers stated that appellant, without any aid, directed them to the alleged scene of the crime. Upon arrival there, appellant stated that he was the one who shot the deceased while the latter was looking at a squirrel's nest. That afternoon the officers took him to the headquarters of the Law Enforcement Division near Columbia where he was questioned for several hours. About nine o'clock that night he made a lengthy statement which was taken down and transcribed by a stenographer, after which it was signed by appellant who was given a copy.

It would unnecessarily add to the length of this opinion to relate the details of the foregoing confession. In substance

it was as follows: Appellant, a 39-year old married man with two children, first met Mrs. Wiggins while both worked in the weave room of the Glenwood Cotton Mills at Easley. In January, 1952, after knowing her about six months, he had a "date" with her, in the course of which they went into the woods and had sexual relations. From that time on they went out regularly, at first about every two weeks and later once or twice a week. Occasionally they would be accompanied by another couple. On Wednesday, November 4, 1953, they had sexual intercourse near a cemetery in Pickens County. It was here that they had their first affair almost two years previously. Both expressed affection for each other and discussed the possibility of being able to live together. Finally, Mrs. Wiggins told him that she was sending her husband to Greenville the next morning and "for me to meet him over there and straighten things out and we would go together and be happy always." That night he went to the home of his son-in-law and borrowed a rifle, stating that he wanted to go squirrel hunting. Early the next morning, November 5th, he bought some cartridges for the rifle, came to Greenville and picked up the deceased. After suggesting that they go squirrel hunting, appellant drove to McCormick County where he shot the deceased while the latter was looking at a squirrel's nest. Deceased fell and appellant shot him a second time. He then returned to Easley. He continued to work in the mill. On Wednesday morning, November 11th, he learned that the body of deceased had been found. On Monday night following he was picked up by the officers and questioned for several hours, but denied any connection with the homicide. The next day he left Easley and went to Mexico. He finally decided that he would return home and surrender. He reached Easley on Monday morning, November 23rd, and found his family at the home of his mother-in-law. He was then informed that a warrant had been issued for him. He indicated a desire to surrender in Columbia but his wife and mother-in-law advised him to

report to the Sheriff at Pickens. He requested that Mr. Ellis, a minister, be called. Mr. Ellis came and after prayers, appellant requested him to call the Sheriff of Pickens County. Following this conversation, he was taken by Mr. Ellis to Pickens where he surrendered.

After signing the above confession, appellant was brought back to the jail at McCormick. A day or so later he indicated a desire to make a further statement. On November 25th, he was again taken to the headquarters of the Law Enforcement Division at Columbia, where shortly after midnight a second confession was signed, which in most particulars was similar to the first. The differences are not very material. In the second statement appellant said he induced the deceased to go out with him on the pretext that he (the deceased) was to be initiated by the "Secret Service" in connection with a job which appellant claimed to have arranged for him with that organization.

Many of the facts stated in the confessions were corroborated by other evidence. To illustrate: In the second statement appellant said that after the homicide he found the deceased's watch in the car and upon returning home near Easley, he threw it in his outside toilet. Later the officers found the watch where appellant said he placed it. In both confessions he stated that on several occasions in going out with Mrs. Wiggins he double-dated with one Charles Gibson. This was confirmed by the testimony of Gibson. The description given in the confessions as to the manner in which deceased was shot and the physical surroundings at the scene was remarkably in harmony with the facts developed at the trial.

The foregoing constitutes a brief summary of the State's testimony. Appellant elected not to take the stand. The principal testimony for the defense related to appellant's intelligence and reputation.

Appellant contends that in considering the sufficiency of the evidence to sustain the verdict, the confessions, to which objection was made at the trial,

must be eliminated because involuntary. The officers denied that appellant was intimidated, abused or threatened in any manner. They said the confessions were made without inducements of any nature and that appellant was repeatedly warned that any statement made by him might be used against him. All of the evidence tends to show that the statements were freely and voluntarily given. No evidence was offered in behalf of appellant to the contrary. We think the confessions were properly admitted. *State v. Grant,* 199 S. C. 412, 19 S. E. (2d) 638; *State v. Judge,* 208 S. C. 497, 38 S. E. (2d) '715; *State v. Scott,* 209 S. C. 61, 38 S. E. (2d) 902; *State v. Miller,* 211 S. C. 306, 45 S. E. (2d) 23; *State v. Brown,* 212 S. C. 237, 47 S. E. (2d) 521; *State v. Livingston,* 223 S. C. 1, 73 S. E. (2d) 850; *State v. Waitus,* 224 S. C. 12, 77 S. E. (2d) 256. The mere fact that they were made by appellant while in the custody of the officers does not render them inadmissible. *State v. Judge, supra; State v. Brown, supra.*

Appellant's exceptions imputing error in not granting his motion for a directed verdict of not guilty are clearly without merit.

In considering the other exceptions, it is well to keep in mind the rule that where, as here, the only rational conclusion warranted by the evidence is that the accused is guilty, the "judgment of conviction should not be set aside because of unsubstantial errors not affecting the result." *State v. Evans,* 202 S. C. 463, 25 S. E. (2d) 492, 495. Also, see *State v. Gilstrap,* 205 S. C. 412, 32 S. E. (2d) 163; *State v. Hariott,* 210 S. C. 290, 42 S. E. (2d) 385.

It is argued that the Court erred in conducting the preliminary inquiry as to the voluntariness of the confessions in the presence of the jury. On several occasions the jury was excused during such examination but in one or two instances the preliminary examination was made and the trial Judge announced his ruling in the presence of the jury.

The question of whether a confession is voluntary is one which is addressed to the Court in the first instance. If there is an issue of fact as to the voluntariness of a confession, it should be admitted and the jury, under proper instructions, allowed to make the ultimate determination as to its voluntary character and also its truthfulness. *State v. Scott, supra,* 209 S. C. 61, 38 S. E. (2d) 902; *State v. Brown, supra,* 212 S. C. 237, 47 S. E. (2d) 521; *State v. Livingston, supra,* 223 S. C. 1, 73 S. E. (2d) 850.

The better practice is for the trial Judge to conduct the preliminary inquiry and determine the admissibility of the confession in the absence of the jury. 20 Am. Jur., Evidence, Section 534; Annotation 148 A. L. R., beginning on page 546. There is authority to the effect that where this is not done and the Court thereafter determines the confession to be inadmissible, prejudicial error results. That question is not now presented and we intimate no opinion thereabout. The great weight of authority is that where, as here, the confessions are finally determined to be admissible, any error in conducting the preliminary examination in the presence of the jury is cured. On page 550 of the annotation in 148 A. L. R., it is stated: "If the trial court after the preliminary examination determines that the confession was voluntarily made, its failure to conduct such examination in the absence of the jury is not ordinarily regarded as reversible error." In addition to the cases cited by the annotator in support of this view, see *Kirk v. Territory,* 10 Okl. 46, 60 P. 797.

We conclude that no harm resulted in the instant case from the fact that on several occasions the preliminary examination as to the voluntariness of the confessions was made in the presence of the jury. Nor do we think there was any prejudicial error in ruling in the presence of the jury that the confessions were admissible. The trial Judge announced his decision in a most formal way without any intimation as to the weight of the evidence.

In *State v. Marlowe,* 156 S. C. 363, 153 S. E. 340, the Court, in an opinion by Mr. Chief Justice Watts, held it was not reversible error to hear and refuse a motion for a directed verdict of not guilty in the presence of the jury. The better practice, however, is to excuse the jury.

It is argued that the trial Judge erred in conducting the preliminary examination as to the voluntariness of the confessions and in doing so, further erred in asking leading questions. Ordinarily examination of witnesses should be left to counsel. *State v. Vickers,* 226 S. C. 301, 84 S. E. (2d) 873. However, the trial Judge is vested with a wide discretion in the conduct of a trial. "It is his duty to see to it that justice be done in every case, if it can be done according to law; and, if he thinks that the attorney for either party, either from inadvertence or any other cause, has failed to ask the witnesses the questions necessary and proper to bring out all the testimony which tends to ascertain the truth of the matter under investigation, we can see no legal objection to his propounding such questions; but, of course, he should do so in a fair and impartial manner and should not by the form or manner of his questions express or indicate to the jury his opinion as to the facts of the case, or as to the weight or sufficiency of the evidence." *State v. Anderson,* 85 S. C. 229, 67 S. E. 237, 238.

A careful examination of this record fails to show that the trial Judge transcended the foregoing limitations. The questions propounded by him were not objectionable in form. He had the responsibility of determining whether a *prima facie* case was made for the admission of these confessions and the right, as well as the duty, to see that the proper questions were asked relating to the issue of whether they were voluntarily obtained.

The further contention is made that on one occasion when the preliminary examination was made in the absence of the jury, the facts and circumstances relating to the procurement of the confessions were not re-

peated when the jury was recalled. It is said that this was prejudicial error under the case of *State v. Rogers,* 99 S. C. 504, 83 S. E. 971. In that case *no* testimony was offered on the question of voluntariness of the confession after the jury was recalled. The Court held that this was error because the burden was upon the State to show the voluntary character of the confession. In the instant case enough was asked of the witness when the jury was recalled to show that the confessions were voluntary.

The only other exception relating to the confessions imputes error in admitting that portion in which appellant stated that on several occasions when he went out with Mrs. Wiggins, they were accompanied by another couple who also had sexual intercourse. It is also argued that the Court further erred in permitting one of the State's witnesses to testify that on two occasions he and another woman "double dated" with appellant and Mrs. Wiggins. We find no error in the admission of this testimony. Testimony relating to the illicit relations between appellant and Mrs. Wiggins was entirely competent as showing motive for the crime. There was nothing in the testimony complained of showing that on these occasions appellant had illicit relations with any person other than Mrs. Wiggins.

We shall next consider the complaint that the solicitor was permitted to comment on. the failure of appellant to testify. In the course of his argument, he discussed at length the confessions made by appellant. He sought to point out that the oral statements first made were untrue. He then proceeded to discuss the written confessions. He conceded that one or two statements contained therein were probably incorrect but argued that the material portions were true and corroborated by other evidence. He then said: "The poor man is dead and gone, but it certainly stands to reason that's probably what happened. Of course we'll never know exactly what happened, *because he was the only one here who can tell us, but he ain't going to tell us,*

*you know.* If he told us, that must be as plain as possible, because it checks with the facts."

Counsel for appellant strenuously argue that the effect of the italicized language was to direct the jury's attention to appellant's failure to take the stand and testify as to what happened. While the meaning of some of the language quoted is not entirely clear, due no doubt to inaccuracies in the stenographic report, we are not in accord with the interpretation advanced by appellant's counsel. The language complained of must be considered in connection with that which the solicitor used before and afterward. After pointing out the conflict between appellant's verbal statements and his later written confessions, we think the solicitor was endeavoring to argue that while all said in the latter may not be entirely true, the material portions represented what probably happened and checked with the facts established by other evidence. The phrase, "but he ain't going to tell us," considered in connection with the context can be reasonably interpreted as meaning that appellant in his written confessions had not disclosed everything that occurred.

Evidently appellant's counsel did not at the time construe this language as commenting on the failure of the appellant to testify, for no objection was made. Neither did the trial Judge receive that impression. The question now complained of was first raised on a motion for a new trial. It is certainly doubtful whether the inference now sought to be drawn by appellant's counsel registered in the mind of any juror. But if by any chance a juror received such an impression, its effect was doubtless removed by the following instruction: "Mr. Foreman and Gentlemen, I charge you that the failure of any defendant to take the witness stand and testify in his own behalf does not create any presumption against him. The jury is charged that it must not permit that fact to weigh in the slightest degree against any such defendant. Nor should this fact enter into the discussions or deliberations of the jury in any manner." See *State v. Wilkins,* 217 S. C. 105, 59 S. E. (2d) 853.

The remaining exceptions relate to the charge. It is claimed that appellant was required to rebut the presumption of sanity "with reasonable certainty", which was equivalent to saying that he must establish his plea of insanity beyond a reasonable doubt. We doubt if the charge, considered as a whole, justifies that construction. Just before using the phrase complained of the jury was charged that appellant must overcome the presumption of sanity by the preponderance of the evidence. Later it was expressly stated that appellant must prove his plea of insanity "not beyond all reasonable doubt but by the greater weight or preponderance of the evidence." The jury was also instructed that if they had a reasonable doubt as to whether he had made out his plea of insanity, he was entitled to the benefit of such reasonable doubt. However, we need not pursue this phase of the case any further because we do not find in the record any evidence of insanity.

While several lay witnesses testified that appellant, who quit school in the third grade, was "to a certain extent weak minded" and had subnormal mentality, none gave any evidence from which it could reasonably be inferred that he was unable to distinguish between right and wrong. All of these witnesses conceded that for a number of years preceding the homicide, he had been regularly employed in a cotton mill. The only expert testimony on the subject of insanity was given by a psychometrist from the South Carolina State Hospital where appellant was taken for observation. He testified that appellant's mental age was eight years and six months and that he had "an intelligence quotient of 71", which he classified as "at least borderline intelligence." This witness stated that the top mental age in such a test is sixteen. He further said that the accuracy of the examination depends to some extent on cooperation and that they found appellant had not cooperated on the first test. This expert conceded that a person of appellant's intelligence could carry on a normal occupation and provide

for his family. He was definitely of the opinion that appellant was able to distinguish between right and wrong.

We held in *State v. Gardner,* 219 S. C. 97, 64 S. E. (2d) 130, 135, that evidence of the character offered in the instant case was insufficient to raise an issue of insanity. It was there stated: "Criminal responsibility does not depend upon the mental age of the defendant, nor upon whether his mind is above or below that of the average or normal man. Subnormal mentality is not a defense to crime unless the accused is by reason thereof unable to distinguish between right and wrong with respect to the particular act in question." Also, see *State v. Fuller,* S. C., 87 S. E. (2d) 287. The record in this case is devoid of any evidence that appellant was unable to distinguish "moral or legal right from moral or legal wrong." The trial Judge would have been fully justified in declining to submit the plea of insanity to the jury.

Finally, it is contended that the Court erred in failing to charge the following request:

"If you should conclude that the defendant is guilty, and further if upon a consideration of all evidence presented you have a reasonable doubt as to whether or not the defendant should be recommended to the mercy of the Court, the law requires that you resolve such reasonable doubt in favor of the defendant and recommend him to the mercy of the Court."

On the question of recommending mercy, the Court charged:.

"And if you should conclude that the defendant was guilty of murder and if you had a reasonable doubt as to whether or not you could recommend mercy, you may recommend mercy for any reason you want or for no reason at all. That's left up to you."

In the request presented, appellant was apparently seeking to invoke the well settled rule that where there are several grades of the offense charged in an

indictment, if the jury finds the defendant guilty but from the evidence or lack of evidence have a reasonable doubt as to whether he is guilty of the higher or lower grade, they should resolve such doubt in his favor and find him guilty of the lower grade. But the effect of our statute, Section 16-52 of the 1952 Code, authorizing a jury where a defendant is found guilty of murder to add a recommendation to mercy, thereby reducing the punishment to life imprisonment, is not to fix two grades of murder. The discretion of the jury as to recommending mercy is an unlimited one. As pointed out in *State v. Jones,* 201 S. C. 403, 23 S. E. (2d) 387, a recommendation to mercy does not have to be based on evidence. It was held in *State v. King,* 158 S. C. 251, 155 S. E. 409, that it was sufficient to simply inform the jury that they may recommend the defendant to mercy, the effect of which is to reduce the punishment to life imprisonment.

Appellant's request was not presented until the conclusion of the charge. It is obvious that the trial Judge sought to make it conform to the foregoing rule that a recommendation to mercy rests entirely in the discretion of the jury and may be exercised independently of whether the evidence warrants it. The instruction given fully protected the rights of appellant in respect to the question of recommending mercy.

As usual in cases of this kind, we have, in *favorem vitae,* carefully examined the record for any errors affecting the substantial rights of the accused, even though not made a ground of appeal. We find none.

We think it is appropriate to state that appellant did not employ counsel. The Court appointed two capable and experienced attorneys to represent him, which they have done with commendable zeal and ability. Their services are acknowledged with appreciation.

Affirmed.

BAKER, C. J., and STUKES, TAYLOR and LEGGE, JJ., concur.