## 17186

THE STATE, Respondent, v. HAROLD BYRD, Appellant

(93 S. E. (2d) 900)

594

*Messrs. Horace L. Bomar, James B. Stephen* and *Roy M. Smith,* of Spartanburg, *for Appellant,*

*Messrs. J. Allen Lambright, Solicitor,* and *J. Wright Nash, Assistant Solicitor,* of Spartanburg, *for Respondent,*

July 12, 1956.

OXNER, Justice.

Upon an indictment charging him with the murder of Curtis Ross on January 22, 1955, appellant, a Negro about 23 years of age, was tried at the June, 1955, term of the Court of General Sessions of Spartanburg County, found guilty and sentenced to death by electrocution.

About 7:00 p. m. on Saturday, January 22, 1955, deceased, a Negro taxi driver, went to a home in a rural section of Spartanburg County seeking help. His clothes were wet and muddy and there was an ice pick protruding from the right side of his neck. He was taken into the home and later removed to a hospital in Spartanburg where he was found to be in a mild state of shock with multiple stab wounds in the chest, neck, forearm and back. At midnight an extended operation was performed and the patient died around 6:00 p. m. on January 23rd.

About 11:00 p. m. on January 22nd, another taxi driver, who had heard of the assault, observed appellant at a filling station in a taxi which he recognized as that of the deceased. Appellant became suspicious of this driver and attempted to escape but before he could do so, the taxi driver snatched the keys from the deceased's taxi and appellant ran. The officers, who had been notified of this incident, then sought to find appellant. He was taken into custody at his grandmother's home near Pauline, in Spartanburg County, about 7:00 p. m. the next day and brought to the county jail. According to the testimony of the sheriff and several other officers, he there made a free and voluntary verbal confession, which was in substance as follows:

On Saturday morning, January 22nd, appellant, who had been out of employment for some time and owed $60.00 for house rent, decided to obtain some money by robbing a taxi driver. He left his home and went to the business section of Spartanburg for that purpose, but "his nerve began to fail him" and as a result, he went to a pool room and later to a movie. During the afternoon he decided to carry out his plans. He hailed the deceased's taxi, got in the front seat, and requested that he be taken to East Spartanburg to see a girl friend. A little later, becoming convinced that deceased was suspicious, he stabbed him in the chest several times with an ice pick, which he had in his pocket. A scuffle ensued and the taxi stopped. Appellant then took what money he

could find, tied deceased's feet with a wire and his wrists with a belt, and put him in the back of the car.

After traveling around in the taxi for some time, appellant stopped and again stabbed the deceased several times with the ice pick. During this assault, the handle came off and was thrown on the side of the road. Appellant then drove to a bridge and threw the deceased over the railing into the river. After this, he went to his grandmother's house where he changed clothes. He then proceeded to his home in Spartanburg and on the way, deciding he had handled a flashlight in the car without gloves, threw it away. When he arrived home he told his wife to get ready and he would take her to her parents' home at Cowpens. While she was doing so, he bought some whiskey, stating that he had not previously consumed any. They remained in Cowpens only a short time and went back to his grandmother's house where he left his wife and drove to a filling station to get some oil. While there he became suspicious of a Negro taxi driver who came to the station and went inside. He then tried to get away but the taxi driver took his keys and he ran. He finally got a friend to take him back to his grandmother's house where he slept Saturday night. The next morning an officer tried to find him there but he escaped. Later a friend prevailed upon him to surrender and he was taken by a former deputy sheriff to the county jail.

The sheriff testified that the next day he took appellant to the various places mentioned in the confession. He found evidence of scuffling on the wet ground and several pennies and a comb at the place where appellant stated he first assaulted the deceased. The handle of the ice pick was found at the point where he said he threw it away. At the home of the grandmother, the sheriff found the muddy trousers which appellant said he had left there. In addition to the foregoing, there were numerous other circumstances corroborating the confession.

Appellant did not take the stand. The only testimony offered by him related to a claim of subnormal mentality.

Two former employers testified that appellant was a hard worker but did little talking and had some difficulty in remembering instructions from one day to the next. When asked about his mental capacity, one of them testified, "he could work and know what to do but as a man, I never did figure he had a man's mind, more of a boy like, you know." Appellant's mother died shortly after he was born and he was reared by his grandmother. She said that he reached the seventh grade in school but had to repeat two grades; that when a baby he suffered from "spasms" and as a boy tried to "show off" and "try his strength" by hitting the wall and throwing the furniture around.

The only other testimony relating to his mental condition was that of a Spartanburg County physician who, while in the service, was for a time a psychiatrist at Fort Jackson. He said appellant was sent to the Mental Hygiene Clinic in December, 1952 because of irresponsibility and "chronic awollism", given a test which disclosed that he had a mental age of eight years and three months, and subsequently discharged from the service. He further stated that he examined appellant just prior to the trial and was still of the opinion that he was suffering from a primary mental deficiency. On cross examination he testified:

"Q. Doctor, you wouldn't by any means say that this boy is insane, would you? A. He is not insane.

Q. And he certainly has a capacity to tell right from wrong, doesn't he? A. He has the capacity to tell right from wrong, but in my determination, and in our determination, he was unable to adhere to the right, and that's the reason why he was discharged from the service. That's the prime reason of it.

\* \* \*

Q. The fact that his years of experience and association with people, and making a living and marrying, wouldn't— that would certainly add to his ability to tell right from wrong as against an eight or nine year old child, wouldn't it? A. It would add, but to a minute degree.

Q. Anyway, there is no question but what he can tell right from wrong? A. That's true."

In reply to the foregoing, a psychiatrist from the South Carolina State Hospital where appellant, by order of the Court, had been sent in February for a thirty day period of observation, testified that appellant was found to be sane and fully capable of distinguishing between right and wrong.

The first exception is that the Court erred in refusing a motion for change of venue or, in the alternative, for a continuance beyond the term upon the ground that appellant could not obtain a fair and impartial trial in Spartanburg County. No affidavits were offered. Counsel argued that Raymond Fuller had just been tried for the third time, found guilty and sentenced to the electric chair and stated that the trial of appellant following this case would be prejudicial. Also relied on in support of the motion were articles appearing in the Spartanburg papers and it was stated that the same facts contained in these stories had also been given over the radio. The newspaper articles referred to are not incorporated in the record. They were carefully examined by the trial Judge who concluded that there was nothing inflammatory or prejudicial therein. He also found no prejudice in the fact that Fuller had just been tried. It is well settled that motions of this kind are addressed to the sound discretion of the trial Judge. We find no abuse of discretion. *State v. Gantt,* 223 S. C. 431, 76 S. E. (2d) 674; *State v. Fuller,* 227 S. C. 138, 87 S. E. (2d) 287; *State v. Fuller* (second appeal), S. C., 93 S. E. (2d) 463.

It is next contended that the Court erred in refusing a motion for a mistrial upon the ground that appellant was highly prejudiced by the fact that the name of Raymond Fuller was mentioned during the trial. In the cross examination by the solicitor of a former employer of appellant, the following appears:

"Q. Raymond Fuller worked all right—I mean Harold Byrd worked all right, didn't he?

A. Yes, he worked all right."

It is argued that one of appellant's defenses was mental deficiency, a defense that had just been rejected by the jury in the *Fuller case,* and that the mere mention of the name of Raymond Fuller was highly prejudicial. It seems to be conceded that one of the jurors who sat on the *Fuller case* was also on the jury trying appellant. We think the motion for a mistrial was properly refused. It is difficult to perceive how any prejudice resulted. It is obvious that the reference by the solicitor to Raymond Fuller was a mere inadvertence which was instantly corrected and, in fact, the incident was not mentioned until the conclusion of the testimony when counsel for appellant made a motion for a mistrial.

There is clearly no merit in the exceptions that the Court erred in permitting the State to introduce in evidence the ice pick, the cord which the State claims was used to tie the feet of the deceased and the handle of the ice pick. Likewise untenable is the contention that the Court erred in permitting the State to offer evidence relating to the wounds inflicted upon deceased.

Error is assigned in the exclusion of a report made by Private Optowsky to the Mental Hygiene Clinic Service at Fort Jackson. It is contended that Private Optowsky was not available as a witness and that this report constituted an official army record which should have been admitted under the rules relating to entries in the regular course of business. This report was identified by the psychiatrist heretofore mentioned who was on the staff of the Mental Hygiene Clinic. He testified: "I can say this. That (report) is not the overall picture. That was just a part. All this man (Private Optowsky) did was to get a good social history." The report purports to contain appellant's family and social history as related by him and the observations made by Private Optowsky as to his appearance and demeanor during the examination. We need not enter into any extended discussion of the exception to the hearsay rule relating to official records. It is sufficient to say that this report,

consisting of self-serving declarations made by appellant and conclusions reached by Private Optowsky, who was not shown to be a psychiatrist or other expert qualified to express an opinion as to appellant's mental condition, was clearly inadmissible and properly excluded. Cp. *Sandel v. State,* 126 S. C. 1, 119 S. E. 776; *Stack v. Prudential Insurance Company of America,* 173 S. C. 81, 174 S. E. 911.

It is next contended that the trial Judge should have submitted to the jury the defense of insanity but we find no evidence that appellant was unable to distinguish between right and wrong in regard to the act of which he was accused. The testimony is uncontradicted that he was sane and had the capacity to distinguish between right and wrong. This is shown not only by the testimony of the psychiatrists but is borne out by the actions and conduct of appellant before and after the commission of the offense. It is true there is evidence of subnormal mentality but this "is not a defense to crime unless the accused is by reason thereof unable to distinguish between right and wrong with respect to the particular act in question." *State v. Gardner,* 219 S. C. 97, 64 S. E. (2d) 130, 135. In *Holloway v. United States,* 80 U. S. App. D. C. 3, 148 F. (2d) 665, 667, the Court said: "For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane." We held in *State v. Fuller, supra,* S. C., 93 S. E. (2d) 463, that under testimony strikingly similar to that presented in the instant case, the Court did not err in failing to charge the jury on the question of criminal responsibility. Also, see *State v. Chasteen,* 228 S. C. 88, 88 S. E. (2d) 880. On the trial of the case counsel evidently regarded the evidence as insufficient to raise the question of insanity because they made no request that the trial Judge charge on this issue.

It is argued that there is testimony that appellant was "unable to adhere to the right" and for that reason was discharged from the service. But the defense of irresistible impulse is not recognized in this State. *State v. Gilstrap,* 205 S. C. 412, 32 S. E. (2d) 163.

Finally, we are asked to modify the "right and wrong" test long followed in this State. We have just recently refused to do so in *State v. Fuller, supra.*

In accordance with the well established practice, we ██ have, *in favorem vitae,* carefully examined the record for any errors prejudicial to the rights of the accused, even though not made a ground of appeal. We find none. The only verdict reasonably warranted by the facts is that of murder. It was the sole prerogative of the jury to recommend mercy and thereby reduce the punishment to life imprisonment. This they declined to do. There is no legal basis for disturbing the verdict and sentence imposed.

Appellant has been ably represented by counsel appointed by the Court. They have discharged their duties with commendable fidelity and zeal. Their services are acknowledged with appreciation.

Affirmed.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.