16006

### STATE v. MILLER
(45 S. E. (2d) 23)

*Messrs. Eugene Pollard, L. E. Wooten* and *J. A. Henry,* of Greenville, for Appellant,

*Mr. Robert T. Ashmore,* Solicitor, of Greenville, for Respondent.

November 7, 1947.

BAKER, CJ.: The appellant, a negro of the age of 21 years, was tried, convicted and sentenced to death by electrocution, at the March, 1947, term of the Court of General Sessions for Greenville County, on an indictment charging him with the rape of a 44 year old maiden woman.

At the time of the appellant's arraignment, and at his request, he was assigned counsel by the Court, who accepted the appointment as officers of the Court, and with commendable zeal and ability represented the appellant throughout the trial in the Court below, and are representing him in his appeal to this Court.

The "Questions Involved" in this appeal are stated by appellant's counsel to be:

"1. In a trial under an indictment for rape should a written confession be admitted in evidence when the accused was not carried before a magistrate and dealt with according to law; when he was not informed that he was not compelled to incriminate himself; and when he was not offered benefit of counsel?

"2. In a trial under an indictment for rape, is the *corpus delicti* proved *aliunde* the confession when the alleged victim does not testify there was penetration, and circumstantial evidence exists of an injury to the vagina which is as compatible with an assault and battery or other traumatic injury as it is with rapacious assault?

"3. Did the Trial Judge abuse his discretion in not rejecting a juror who in his *voir dire* examination stated that

he had formed an opinion as to the guilt or innocence of the appellant but that it would not take any evidence to remove that opinion?"

We shall undertake, as nearly as is possible, to discuss these questions *seriatim,* but prior to so doing, it is necessary that we state briefly the pertinent facts as they appear in the record.

The prosecutrix (victim) resided at Fountain Inn, in the County of Greenville, on Fairview Street which intersects with Main Street, her place of residence being a little more than a quarter of a mile from said intersection. On the evening of November 20, 1946, at approximately 7:30 o'clock, she left the home of a sister, who resided on Main Street, to walk to her home on Fairview Street. It was then dark and all street lights had been turned on. Between Main Street and the home of the prosecutrix, there is a branch over which the street, including the paved sidewalk, crosses or passes. When she was nearly to the branch, and where there were no residences, her attention was attracted by hearing some one walking real fast right behind her, and she stepped aside so as to permit such one to pass. The fast walking person did not pass, but grabbed the prosecutrix from behind and threw her down in a hole on the branch side of the sidewalk. When she commenced to holler, he started choking her and told her to hush that hollering, and when she didn't, he choked her until she was unconscious, she still having one mark on her throat at the time of the trial (March, 1947) from the hands and fingers of the person who attacked her. She received scratches all over her face, and the following day her left eye was blood-shot, and her forehead was very sore. She was down on the ground in the bushes and briars at the time she was choked and lost consciousness. While down on the ground on her back she momentarily regained consciousness and heard her attacker twice say to her, "Open up them knees", and does not remember anything else that occurred, losing consciousness again. When she again regained consciousness she was alone

and was climbing out of the branch—coming up the bank. She was confused, and had to stand at a post in a field until she could locate the house in which she lived, but before she got out of the field her brother and young nephew had gone out looking for her, and with the aid of a flashlight located her in the field, and took her on home where she was placed in bed. She immediately related to a sister the ordeal to which she had been subjected. She was bloody and her privates had been torn, and she was suffering pain from the penetration of her private organs. The step-ins which she was wearing were torn and bloody, and the coat she was wearing also had blood on it about the middle and on the left souldder. In fact, every garment she was wearing at the time of the attack made upon her had some blood on it—some more, some less.

The prosecutrix was unable to see her attacker well enough to identify him or even to say definitely if he was white or colored. All she could say was that "he was not so very big", and that "he had on some kind of short coat or jacket". His voice was not familiar to her.

Immediately after the prosecutrix was led to her home, Dr. Herbert Vaughan, a practicing physician at Fountain Inn, was summoned and arrived within a few minutes. He testified that he found the prosecutrix suffering with shock; that she was highly nervous and was bleeding a good deal from her vagina, and lacerated; that there was evidence of having been choked or something, a few scracthes on her face and a lick or two on the head; that there were broken places on her throat and her throat was bloody; that inside of her thighs "were blue and several finger marks on them as if they had been squeezed or mashed, and kinda torn a little"; that upon an examination of her private organs outwardly and inwardly he "found that she had been lacerated and she was bleeding from up in the vagina, a blood vessel was still bleeding"; that force had to be used to have torn her as she was, and that there was definitely a penetration into her private organs because there were abrasions farther

up in her privates; that the lower portion of the hymen was ruptured and that she had lost considerable blood; and that his professional opinion was that she was a virgin prior to this attack.

Following the emergency treatment at her home by Dr. Vaughan, the prosecutrix was carried to a hospital in Greenville where she remained for two weeks. Upon her arrival there, she was examined and treated by Dr. R. L. Cashwell, whose testimony is corroborative in every vital particular of the testimony of Dr. Vaughan, and in addition he testified that she complained of soreness in her chest and that she had some bruises on her lower chest. The prosecutrix was still bleeding from the vagina at the time Dr. Cashwell examined her.

The foregoing facts relate in the main to Question 2, but we think it proper that such brief history of that portion of the case be first given.

The record discloses only by inference the information which prompted the officers of the law to arrest the appellant approximately two months after the attack was made on the prosecutrix. When the appellant was arrested, he was not informed that he was charged with raping the prosecutrix. He was first carried to the Police Headquarters in Fountain Inn on the night he was arrested, and from there to the common jail for Greenville County, where he was incarcerated until the next day, about 3 o'clock P. M., when the Sheriff of Greenville County and two of his deputies returned with him to Fountain Inn, and it was while being questioned at Police Headquarters there that he made and signed the confession which was admitted in evidence over the objection of his counsel on the ground that "the confession under the circumstances was illegally obtained and therefore not admissible against appellant."

It does not appear from the record that at the time of the confession by the appellant, he had been formally charged with the crime of rape, that is, he had not been carried be-

fore any committing judge or magistrate and no order or warrant for his arrest had been issued. Appellant therefore undertakes to invoke the aid of Sections·907, 1011 and 1012 of the Code of 1942.

A casual reading of Section 907 discloses that it merely purported or intended to confer the right and power upon any citizen or person to make an arrest of a felon under certain circumstances, but only for the purpose of taking the alleged felon before a Judge or Magistrate "to be dealt with according to law"; and that such section is not apposite to the facts of this case. Nor is Section 1011 apposite. The appellant was not on trial in the sense intended by the statute at the time he is alleged to have made a confession.

The pertinent portions of Section 1012 of the Code, and of Article 1, Section 17 of the Constitution of 1895, read in their order follows: "No person shall be required to answer any question tending to criminate himself * * *."; and "Nor shall (any person) be compelled in any criminal case to be a witness against himself".

"Confession", in legal sense, is restricted to acknowledgment of guilt, and does not apply to mere statement of fact from which guilt may be inferred. *State v. Pittman*, 137 S. C. 75, 134 S. E. 514.

In *State v. Baker*, 58 S. C. 111, 36 S. E. 501, 502, it is stated: "In disposing of the question raised as to the admission of a confession of guilt by the defendant when reduced to writing, we may remark that the written confession in this case was made without solicitation, importunity, promise, or threat being used to induce the same. Confessions are admitted if made voluntarily. The jury is not required by law to believe a confession. The jury may accept a part and reject the balance. All the safeguards thrown around confessions by the law are to insure truth. Once is it ascertained that the confession is true, no great attention is paid to technical rules. For instance, it was at one time held that a person charged with crime must be admonished

that, if he made any statement against himself, it would prejudice his case; but in *State v. Workman,* 15 S. C. (540) 544, this court held that 'no previous warning was necessary'. In that case, quoting from 1 Greene, Ev. § 299, it was said: 'Neither is it necessary to the admissibility of any confession, to whomesoever it may have been made, that it should appear that the prisoner was warned that what he said would be used against him. On the contrary, if the confession was voluntary, it is sufficient, though it should appear he was not warned.' "

In *State v. Simmons,* 112 S. C. 451, 100 S. E. 149, 150, objection was made to an alleged confession made by the defendant to policemen at the police station where he was taken following his arrest. The objection was overruled, and was made an exception upon appeal to this Court. There, as in this case, the position was taken that the defendant was a Negro youth (19 years of age), ignorant of his rights and without friend or counsel, and was not warned or advised by the policemen who had him in their custody, that he had the right to refuse to answer their questions. In passing on this exception, the Court said in part, "*  *  *  in deciding whether confessions made to an officer having the party in custody are free and voluntary, or are influenced by threats or other inducements the conduct of the officer will be rigidly scrutinized; nevertheless, that it rests in the judgment and discretion of the trial judge to decide, in the light of all the circumstances, whether the proper foundation has been laid for the admission of such testimony, and that his ruling will not be disturbed, unless it is clearly wrong and prejudicial".

The general rule, though not an absolutely inflexible one, as to the admissibility of a confession is stated in *State v. Rogers,* 99 S. C. 504, 83 S. E. 971, and quoted with approval in *State v. Danelly,* 116 S. C. 113, 107 S. E. 149, 14 A. L. R. 1420, and in *State v. Melton,* 186 S. C. 478, 196 S. E. 181, as follows: "A confession is not admissible unless it is voluntary, and the question whether it is voluntary must be determined, in the first in-

stance, by the presiding judge, but the jury must be the final arbiters of such fact". Citing *State v. Branham,* 13 S. C. 389; *State v. Workman,* 15 S. C. 540, and *State v. Carson,* 36 S. C. 524, 15 S. E. 588. In this connection see also *State v. Carson,* 131 S. C. 42, 126 S. E. 757, and *State v. McAlister,* 133 S. C. 99, 130 S. E. 511.

The testimony of the officers of the law was uniform that the verbal confession of the appellant, later reduced to writing, and signed by him by his mark, after it had been read to him, was freely and voluntarily made. To the same effect is the testimony of two citizens of Fountain Inn, neither of whom are law enforcement officers. The witnesses to the confession (verbal and written) were categorically asked if the appellant was in anywise mistreated, threatened, or promised any hope of reward before making his confession, and all replied in the negative, Sheriff Bearden who was conducting the investigation volunteering the information that the appellant "was not even talked to rough". It must be borne in mind that at the time of this investigation the officers of the law were merely working on questionable information which they had received from some source, and were trying to determine if the appellant was the perpetrator of the crime. They did not then know that the appellant was an escapee from the Spartanburg County Chaingang where he was serving a 40 year sentence for assault with intent to ravish. Indeed, the appellant does not contend that he was put in fear of his life or that he was promised anything by way of reward or otherwise, his only contention being that while he was being questioned one of the officers stood behind him and would "geetch" or "gooch" him in the back, kept on "jooging" and "geeching" him in the back, and that under these circumstances, he told them that if they wanted him to take it on himself, he would do so. At one place in the appellant's testimony he stated that when he continued to deny any connection with the offense about which he was being questioned, that is, knowing anything about it, an officer who was pointed out, but not named, told

him that he would know something about it "before we get through with you", but the appellant does not claim that such statement by the officer caused him to make a confession. It should also be stated that upon the trial of the case, the appellant repudiated the written (and verbal) confession which the State had put in evidence.

It is our opinion that the trial Judge did not err in ██ permitting the introduction in evidence of the signed confession of the appellant, and that it then became the duty of the jury to finally pass upon the issue whether it was voluntarily made.

The *corpus delicti* in this case is the substantial fact ██ that the prosecutrix was ravished, that is, that some male person had carnal knowledge of her by the use of force and against her will. The brief recital of the facts set forth hereinbefore, we think, leave no doubt but that the crime of rape was committed on the prosecutrix, although by reason of having been choked, beaten and otherwise brutally treated, she became unconscious and was unable to testify of her own knowledge that there had been a penetration of her sex organ by the sex organ of her male assailant. The circumstantial evidence in this case is as convincing as if the prosecutrix had been able to testify of her own knowledge that there had been a penetration of her sex organ by the sex organ of her attacker. As stated in 44 Am. Jur. in Section 101, at page 965, "the *corpus delicti* may be proved in whole or in part by circumstantial evidence, the same as any other fact in controversy". All of this testimony was in evidence prior to the prosecution offering in evidence the alleged confession of the appellant. Therefore, the rule of law that until there is proof *aliunde* of the *corpus delicti,* extra-judicial confessions are not admissible in evidence, is not available to the appellant.

We now come to the third and last issue raised by this appeal. During the impaneling of the trial jury each juror was examined on his *voir dire* by the trial Judge. The Court

permitted counsel for the defense to supplement his own examination if they so desired, and this privilege was freely exercised.

At the time a prospective juror (Mr. Truman Fowler) was called, the defense had exhausted all peremptory challenges. We here set forth the *voir dire* examination of this juror, substituting the words "the prosecutrix" for the name of the maiden woman concerning whom inquiry was made.

"The Court: Mr. Juror, are you related by blood or marriage to the prosecutrix? A. No, sir.

"Q. Have you formed or expressed any opinion as to the guilt or innocence of the defendant in this case? A. Yes, sir.

"Q. You have; well, having formed or expressed that opinion do you think it would take some evidence to remove that opinion from your mind? A. I don't think so.

"Q. You don't think so? A. No, sir.

"Q. By that you mean you could lay that opinion aside and go on the jury panel and decide the case according to the law and the evidence in the case? A. Yes, sir.

"Q. Without prejudice against the defendant? A. Yes, sir.

"Q. Now, Mr. Juror, are you conscious of any bias for or prejudice against the defendant? A. No, sir.

"Q. Do you know of any reason why you cannot give him a fair and impartial trial? A. No, sir.

"Q. And render a verdict according to the law and the evidence in the case? A. No, sir.

"Q. Are you opposed to capital punishment in a proper case? A. No, sir.

"The Court: Present him.

"By the Solicitor: Present him.

"By Mr. Wooten (of counsel for the defendant) : Q. Mr. Juror, you stated a moment ago you had formed or expressed an opinion in regard to this case? A. Yes, sir.

"Q. Having formed and expressed that opinion you mean to tell us it would not take any testimony whatsoever to remove that opinion from your mind? A. No, sir.

"Q. How did you form that opinion, from what you heard or what you read? A. It happened right there at home and I just formed an opinion.

"Q. Just what you heard around the community? A. Yes, sir.

"Q. And you formed an opinion; that is a pretty definite opinion? A. It is an opinion, but I can lay that aside.

"Q. And you can just lay that aside and forget all you previously had in your mind, and lay that aside and go on that jury without any thought of that opinion at all; is that correct, sir? A. Yes, sir.

"Q. You say you live—this happened in the community in which you live? A. Yes, sir.

"Q. Have you discussed it with people around in the community? A. Oh, it has been talked all around there, yes, sir.

"Q. And the opinion you have formed can just be removed, you can just forget it and—A. And go according to the evidence.

"By Mr. Wooten: If your Honor please, we have exhausted our peremptory challenges and we are going to object to this juror for cause. * * * (Argument)

"The Court: Wait a minute, that doesn't mean, Mr. Juror, you are excused. How far do you live from the scene of this alleged—A. About five miles.

"Q. In about five miles? A. Yes, sir.

"Q. You live in the country? A. Yes, sir.

"Q. Are you or not related at all to the prosecutrix? A. No, sir.

"Q. Either by blood or marriage? A. No, sir.

"Q. And you state you know of no reason why you can't give him a fair and impartial trial and render a verdict according to the law and evidence in the case? A. No, sir.

"The Court: I will have to pass him up, he qualifies.

"By Mr. Wooten (of counsel for the defendant) : We just enter our objection to it.

"The Court: Yes, sir, all right, take your seat."

This precise issue has been raised numbers of times in this State, under similar, if not identical facts, and has been consistently decided adversely to the position of the appellant. One of the comparatively recent and leading cases before this Court in which the question under discussion was decided is that of *State v. Pridmore,* 163 S. C. 73, 161 S. E. 335, 336. We quote from that case.

"Was it error for the presiding judge to present a juror to defendant as impartial after the juror had stated that he had formed an opinion from reading the sworn evidence at the former trial; the juror saying, however, that he could render a verdict on the law and the evidence?

"The juror, Gullick, was being examined on his *voire dire.* He did state that he had formed an opinion predicated upon reading the testimony taken at the former trial. But he also stated that he had not read all of that evidence; that he was not related to the deceased or the defendant; that he was not conscious of any prejudice against the defendant, nor bias for the state; and that he could and would render a fair and impartial verdict based upon the evidence adduced at this trial, and upon the law as given the jury by the court.

"It is conceded in argument that the question of deciding upon the impartiality of the juror lay in the sound discretion of the court. He saw the juror, could judge of his capacity, his intelligence, his ability to comprehend the questions put to him, and whether he answered them truthfully. There is nothing in the record to show that there was an abuse of discretion here."

Following the quotation just above, the opinion then quoted at length from the cases of *State v. Bethune,* 86 S. C. 143, 144, 67 S. E. 466; and *State v. Milam,* 65 S. C. 321, 43 S. E. 677; and then discussed the case of *State v.*

*Graham,* 161 S. C. 362, 159 S. E. 838. It would be a work of supererogation for us to undertake to add anything to what has been written in the cases to which reference is made. However, we do call attention to *State v. Faries,* 125 S. C. 281, 118 S. E. 620; *State v. McDonald,* 184 S. C. 290, 192 S. E. 365; and *State v. Woods,* 189 S. C. 281, 1 S. E. (2d) 190.

We do not find from the record that any error of law was committed in the trial of this case, and the jury settled the facts. All exceptions are overruled.

Affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.