448 F.Supp. 886 (1977)
Ex parte Robert Marrion COBB, Petitioner.
UNITED STATES of America
v.
Robert Marrion COBB et al.
Crim. No. 76-279.
United States District Court, D. South Carolina, Spartanburg Division.
July 14, 1977.
Thomas E. Lydon, Jr., U. S. Atty., D. S. C., Columbia, S. C. and William A. Coates, Asst. U. S. Atty., Greenville, S. C., for the Government.
Horace C. Smith and Thomas W. Whiteside of Whiteside, Smith & Taylor, Spartanburg, S. C., for Robert Marrion Cobb during trial. William B. Long, Jr., of Long, Black & Gaston, Greenville, S. C., for Cobb during his application for bail pending appeal, and on appeal to the Fourth Circuit.
HEMPHILL, District Judge.
On December 14, 1976, there was lodged in the United States District Court for the District of South Carolina, Spartanburg Division, Criminal Indictment No. 76-279, a superseding Indictment, entitled: United States of America v. John Jeffrey Barker, Mitchell Tyrone Gaston, Ansel Charles Gideon, Osborn Earl Rosman, and Robert Marrion Cobb. The Indictment charged each *887 and every one of them with bankrobbery, in violation of Title 18, United States Code, §§ 2113(a), (d) and 2. The Grand Jury rendered a true bill on said Indictment, and petitioner, accompanied by his retained counsel, entered a plea of Not Guilty on December 22, 1976.
On March 18, 1977, the case was tried before a jury which returned a verdict of Guilty as to the petitioner. On March 28, 1977, defendant was given the following sentence:[1]
The defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of twenty-five (25) years, and defendant shall become eligible for parole under 18 U.S.C. § 4205(b)(2), at such time as the Parole Commission may determine.
At the time of sentencing counsel for defendant renewed his motion for a bond on appeal, and stated that the Notice of Appeal had been filed.[2] The court took the matter under advisement, noted the presence of William B. Long, Jr., Esquire, as counsel, who was hired to assist trial counsel in a review of the record to determine whether or not appeal should be perfected. The court did not have the record at the time and the matter was continued until Mr. Long could review the record. A hearing was set for April 11, 1977, at 12:00 o'clock Noon. In due time the Petition for Bail was heard; the opposition of the government was heard at the same time.
At the bail hearing,[3] counsel stated, later confirmed in brief of petitioner, that the only appealable issue which counsel could discern on a review of the transcript of record was the issue of whether the court should have advised the jury on the voluntariness of a "confession" made by defendant to FBI Agent McCormick.
This court has reviewed in detail the able brief for petitioner, the cases cited, and the transcript of record. Unfortunately, in situations such as exist here, the court has to pass upon whether or not it has made a possible error. If the court were convinced that it made an error which prejudiced the fair trial of the accused, it would be the duty of the court to immediately discharge the defendant and grant a new trial, sua sponte. The question, however, is whether or not the issue raised by the petitioner is an appealable issue, and this court has diligently searched the record with an attitude favorable to the accused. The court is not convinced that an appealable issue exists for the reasons hereinafter set forth. If the court was convinced that an appealable issue existed, then the court would repair to the question of what bail would be sufficient to guarantee the appearance of the petitioner at this court or some other, as the decision on appeal would make necessary, meanwhile to insure "the peace and dignity of the state" [sic].
The record reveals the following colloquy during the trial (without the presence of the jury).
[P. 218, tr.]
DIRECT EXAMINATION(continuing) (FBI Agent McCormick)
Q. (By Mr. Harper) When was the first time you talked to him?
A. I talked to Mr. Cobb on November 10th, 1976.
Q. And before talking to him, did you advise him of his constitutional rights?
A. I did.
Q. Did you identify yourself, Mr. McCormick?
A. I did.
*888 Q. And advised him of his constitutional rights? Did you tell him what the purpose of your talking to him was?
A. I did.
Q. And what was that?
[P. 219, tr.]
A. I told him I wished to talk to him concerning the robbery of the Pacolet Bank and any implication he might have had in the bank robbery.
Q. Did you advise him of his constitutional rights?
A. I did.
Q. And what rights did you advise to him?
A. I exhibited to him an Advice of Rights Form, which we have a standard form. He read it, stated he understood it, but declined to sign it.
Q. Did you threaten him or coerce him in any way?
A. I did not.
* * * * * *
Q. (By Mr. Harper) Did you threaten him or coerce him in any way?
A. I did not.
Q. Did you ask him whether he knew what the form was about?
A. I did.
Q. And did you ask him whether or not he understood the form?
A. He stated he did, but he didn't wish to sign it at that time.
Q. Did he ask for an attorney?
A. He did not.
Q. Did you tell him one could be appointed in case he wanted one?
[P. 220, tr.]
A. It said it in the form.
Q. All right. Did he ask you any questions about the form that would indicate to you, as an experienced FBI Agent, that he did not understand his constitutional rights?
A. He did not.
Q. All right. Did he agree to answer any questions?
A. He did.
Q. Did he agree to waive his constitutional rights?
A. He did.
MR. HARPER: That would be our showing on the constitutionality of his rights, and the constitutionality of any statement he might have given.
COURT: Do you wish to examine on this part of it?
MR. WHITESIDE:[4] Your Honor, I don't see any objection to his testimony.
COURT: I don't either to this point. If you want to examine him to test him, that's the reason I excused the Jury. He said the man was going to testify about some statement or something, and I said, we will have to excuse the Jury because I don't want something to come out that would be objectionable. Go ahead.
Q. (By Mr. Harper) Did he sign the form?
A. No, he did not.
Q. But he did agree to answer the questions?
[P. 221, tr.]
A. He did.
Q. Did you ask him whether or not he owned a gun?
A. I did.
Q. And what did he say?
A. He said he never owned a weapon.
Q. Did you ask him whether or not he knew Mr. Barker, Mr. Rosemond and Mr. Osmond?
A. I did.
Q. What did he say?
A. He said that he did not know them.
Q. Did you show him pictures of Mr. Rosemond and Mr. Osmond?
A. I did.
Q. Did he identify these pictures?
*889 A. He said he did not know them.
Q. Did you ask him whether or not he had ever been to Pacolet?
A. I did.
Q. What did he say?
A. He said he had never been to Pacolet in his entire life?
Q. Subsequent to this interview, did you have occasion to talk to him again?
A. Yes, I did, I had another occasion to talk to him.
Q. When was that?
A. On December 15th.
Q. And did you advise him of his rights again?
A. I did.
[P. 222, tr.]
Q. Was he aware of his rights?
A. He was.
Q. Was it your judgment that he understood his rights at that time?
A. It was.
Q. What, if anything, did he tell you at that time?
A. He didn't tell me anything at that time.
Q. Did you ask him whether or not his name was Robert Marrion Cobb?
A. I did.
Q. What, if anything, did he say?
A. He denied his identity.
Q. Did you ask him whether or not he was Bobby Cobb?
A. I did.
Q. What, if anything, did he say?
A. He denied his identity.
[P. 230, tr.]
(BEFORE THE JURY)
Q. State your name please?
A. John McCormick.
Q. By whom are you employed?
A. By the Federal Bureau of Investigation.

* * * * * *
Q. All right, sir. Mr. McCormick, do you know an individual by the name of Robert Marrion or Bobby Cobb?
A. I do.
Q. And is he in the courtroom here today?
A. He is.
Q. Would you please point him out and tell us how he is dressed?
A. Mr. Cobb is sitting next to Mr. Whiteside. He has the blueish grey checkered suit on.
Q. Did you see Mr. Cobb around the time of the bank robbery?
A. I did.
Q. And when did you see him?
A. I saw Mr. Cobb on November 10th of 1976.
Q. Did he look similar to his appearance now, or was there some difference?
A. There was a difference.
Q. And what was the difference?
A. His hair was much lighter, it was an orange reddish color.
Q. An orange reddish color?
A. That's correct.
Q. So, it would be lighter than it is now?
[P. 237, tr.]
A. Yes, sir.
Q. Mr. McCormick, on that occasion, did you talk to Mr. Cobb?
A. I did.
Q. Did you advise him who you were?
A. I did.
Q. What did you tell him?
A. I advised him of my identity as a Special Agent of the Federal Bureau of Investigation. I exhibited to him my credentials which contained my picture on it identifying me. I told him I wished to talk to him concerning any participation he might have had in the Pacolet Bank robbery on 10-29-76, and also, at this time, I exhibited to him an interrogation advice of rights form which I asked that before he answer any questions, that he read it and sign it.
*890 Q. Does that form advise him of certain constitutional rights that he has?
A. It does.
Q. Would you read that form to the Jury, please?
A. Yes, sir. It's title, "Interrogation Advice of Rights." It's got a time, place, a date and a time, which I filled in at the time. It starts off: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to your lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer any questioning now, questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer." Then there is another section, "Waiver of Rights." And it reads: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Then there is a place for a signature and also a witness and ending time.
Q. Do you know whether or not Mr. Cobb signed that statement?
A. Mr. Cobb stated he understood his rights but he declined to sign the statement.
Q. Can I have that?
MR. HARPER: We would offer this in evidence without objection.
(Thereupon Government's Exhibit 7 marked in evidence.)
Q. (By Mr. Harper) Mr. McCormick, it's your testimony that you read the information and that you gave this form to Mr. Cobb, is that correct?
A. That is correct.
Q. And this was on November the 10th?
A. November the 10, 1976.
Q. And he read it in your presence?
A. He did.
Q. And you asked him whether or not he understood it?
A. I did.
Q. And did he say that he understood it?
A. He said he did.
Q. Did you threaten or coerce him in any manner?
A. I did not.
Q. Did he say he wanted a lawyer?
A. He did not.
Q. Did you ask him whether or not he would answer questions?
A. I did.
Q. And did he agree to answer questions?
A. He did.
Q. In your judgment as a law enforcement officer, did he appear to be under the influence of any drugs or narcotics or alcohol or anything at that time?
A. He did not.
Q. In your experience as a law enforcement officer, did he appear to understand and to know what was on that form, understand his constitutional rights.
A. He did.
Q. Did you proceed to ask him questions?
A. I did.
Q. Mr. McCormick, did you ask him whether or not he owned a firearm?
A. I did.
Q. What did he say?
A. He stated that he never owned a weapon of any kind.
Q. He never owned any weapon of any kind?
A. He never owned a weapon of any kind.
Q. Did you ask him whether or not he had ever been to Pacolet, South Carolina?
*891 A. I did.
Q. What did he say?
A. He stated that he had never been to Pacolet in his life.
Q. Did you ask him if he knew an individual by the name of Jeffrey Barker, Osmond Rosemond or Mitchell Gaston?
A. I did.
Q. What did he say?
A. I asked him if he knew any of these individuals and he said he did not.
Q. Did you show him any photographs?
A. I did.
Q. And who did you show him photographs of?
A. I showed him photographs of Mitchell Tyrone Gaston and Osmond Earl Rosemond.
Q. Did he say he could identify any of them?
A. He stated he had never seen them before.

* * * * * *
[P. 242, tr.]
QUESTIONS BY MR. WHITESIDE:
Q. Mr. McCormick, as an FBI Agent of long standing, and a good friend of mine, too, you consider it your duty, of course, in delivering your testimony, to relate any fact that might be in the Defendant's favor, don't you?
A. Yes, that's correct.
Q. Now, you have testified here today that Mr. Cobb said he didn't know Barker and he didn't know Rosemond and he didn't know Gaston, right?
A. That's correct.
Q. But you didn't testify that he told you that he didn't have anything to do with this robbery, didn't he?
A. He did say that.
Q. But you didn't testify to that, did you?
A. I wasn't asked that question.
Q. You weren't asked that question, and you weren't going to volunteer it, were you?
A. No, sir, not unless
Q. Yet you just said to me that it was your duty to bring out whatever might be in his favor.
A. Just the same way I wouldn't answer any other question other than what you asked me.
[P. 244, tr.]
Q. (By Mr. Whiteside) I will ask you again, didn't he, when you talked with him, emphatically deny that he knew anything about that Pacolet Bank robbery?
A. He did.
Q. He did. Now, Mr. McCormick, as an FBI Agent, you have some expertise in the area of fingerprints, don't you?
A. I do.
Q. And I ask you if you had this gun analyzed and examined for fingerprints?
A. I did.
Q. You didn't testify to that either, though, did you? And I ask you further, if it isn't true you did not find the Defendant, Bobby Cobb's fingerprints anywhere on this gun?
A. I did not.
MR. WHITESIDE: That's all, thank you.
This court has carefully reviewed the able brief furnished by petitioner, and particularly the case of Inman[4a] and Mullins[5] and Sauls.[6] In each of those cases, the first two arising out of charges under the Dyer Act (18 U.S.C. § 2312), the last mentioned out of the kidnapping statute, the issue was whether or not the jury was properly advised as to the freedom and voluntariness required before a "confession" could be given credibility; there was no question but that a confession was involved in each case. *892 This court is of the opinion that a confession is not involved in this case; petitioner as well as the government is entitled to have the benefit of the court's research.
In 1968, the Congress enacted into the law, and the President signed, the Omnibus Crime Control and Safe Streets Act of 1968. In the Congressional and Administrative News[7] there is a discussion of the Act of the Congress, legislating in this field,[8] as the resort to legislation is testified by the inclusion in the Senate Report: "The Supreme Court itself suggests that Congress is free to enact legislation in this field." There is no doubt that Congress, in the enactment of which is now 18 U.S.C. § 3501, and in defining the term "confession" had the Miranda case in mind. In fact, the Committee Report cites:
The Committee is convinced from the mass of evidence heard by the subcommittee, much of which is printed in the transcript of hearings, that the rigid and inflexible requirements of the majority opinion in the Miranda case are unreasonable, unrealistic, and extremely harmful to law enforcement.[9]
Of course this court is mindful of the requirement of 18 U.S.C. § 3501(a), (e):
Admissibility of confessions
(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.
* * * * * *
(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.
The Congress was concerned with reception of confession in criminal trials and delegated to the federal trial court the responsibility of carrying out the statutory directions which are included in the act in question. There is no doubt but the "confession" as defined includes self-incriminatory statements, as subsection (e) supports. Unfortunately for the purposes of this decision, the Congressional Report does not make the distinctions that counsel for defendant would have projected here. Significantly, the Report quotes from the dissenting opinion of Mr. Justice Harlan, quoting Mr. Justice Cardoza:
Justice, though due the accused, is due the accuser also. The concept of fairness must not be strained until it is narrowed to a filament. We are to keep the balance true.
The Senate Report does go on to express:
By the expressed provisions of the proposed legislation the trial judge must take into consideration all the surrounding circumstances in determining the issue of voluntariness, including specifically enumerated factors which historically entered into such a determination. Whether or not the arrested person was informed of or knew his rights before questioning is but one of the factors. There is the added safeguard that the jury must be instructed to give the confession or statement the weight that they feel warrants under all circumstances.[10]
The question here is not so much what a confession is but what a confession is not.
*893 The statute and the common law, as well as the impact of Miranda direct that the voluntariness of a confession, as such, must not only be determined by the judge, in voir dire or in camera examination, but also given to the jury as an issue, if the issue is raised, or if the issue is present. Of course, to classify statements by an accused as a confession, when it really is not a confession, would not only be a comment on the facts of the case by the judge, but would, in effect, instruct the jury that defendant had in fact made a confession, (when he had not) and give a connotation of guilt which would be most unfair to the accused. We examine for definitions and guidance.
In North Carolina, "confession" is generally defined as "an acknowledgment in expressed words by an accused in a criminal case of his guilt to the crime charged or of some essential part of it." State v. Fox, 277 N.C. 1, 175 S.E.2d 561 (1970).[11] In Maryland, "confession" implies that the matter confessed constitutes a crime. Delnegro v. State, 198 Md. 80, 81 A.2d 241, 245 (1954).[12] In Opper v. United States, 348 U.S. 84, 90, 75 S.Ct. 158, 163, 99 L.Ed. 101 (1954), a "confession" is "an acknowledgment in express words, by the one accused in a criminal case, of the truth of the guilty fact charged or some essential part of it;" . . . "acknowledgment of a subordinate fact, not directly involving guilt, not essential to the crime charged, is not a confession."[13] Other cases are of similar impact.[14]
This court notes, also, that there is a distinction between an "admission" and a "confession". While this court would hesitate to classify Cobb's denial of any facts relating to the crime as an "admission", the distinction exists in the eyes of the law, and the two are not the same. As stated in Holland v. State, 244 Md. 671, 224 A.2d 864 (1966), a "confession" is the direct acknowledgment of guilt whereas an "admission" is a statement of pertinent facts which, in connection with proof of other facts tends to prove guilt. A statement given to police officers, by one accused of murder, that, alia, had gone to the deceased's home, seen her body on the floor through the door, picked up the sword which had blood on it, taken deceased's automobile keys, wiped the door knobs free of fingerprints, and had driven off in the automobile, but did not call police because he did not think of it, was not a "confession" although it contained damaging admissions. Kier v. Estate, 213 Md. 556, 132 A.2d 494, 497 (1957). If the defendant had made an "admission", however, this court, in an abundance of caution would have treated it with the same caution as a confession demands. But he made neither admission nor confession.
In Corpus Juris Secundum[15], Criminal Law § 816, one finds:
A confession is generally defined as an acknowledgment by accused in a criminal case of his guilt of the crime charged. A confession implies that the matter confessed constitutes a crime, and it is limited in its nature and in its precise scope *894 and meaning to the criminal act itself. In order that a statement may constitute a confession it must be made after the offense has been committed, and must be of such nature that no other inference than the guilt of the confessor may be drawn therefrom. Accordingly, the term "confession" excludes exculpatory statements * * * and in general all statements, declarations, and admissions, by word or act, which do not amount to an acknowledgment of guilt.
It occurs to the court that if the Congress had intended to include, under the provisions of Section 3501, supra, all statements, exculpatory and otherwise, in its statutory consideration and direction, it would have used the word "exculpatory" or "admissions" instead of confining subsection (e), supra, to the word "confession". Of course, the South Carolina law is not controlling here, despite the fact that the crime was allegedly committed in that State, but South Carolina has defined:
"Confession", in legal sense, is restricted to acknowledgment of guilt, and does not apply to a misstatement of fact from which guilt may be inferred.[16]
It can easily be seen here that the statements made by the accused to the FBI Agent do not constitute a "confession", or an "admission". Thus, it becomes a question of whether or not the district judge committed error in instructing the jury to the voluntariness of a confession which was not a confession. The court, without benefit of objection by counsel, and not realizing that this issue would be later raised, did not consider the statements as a "confession", and did not catalogue the statements made by the accused as such. To this court, at trial and now, the statement was at best exculpatory, a denial of guilt. This court was under no duty to cast a shadow of doubt upon his denial. Defendant was entitled to, and received, full benefit from his lack of admission or confession.
It would be untrue to say that the court, at the time of the trial, was able to give the matter all the consideration which, hopefully, this order affords. In the trial of a case, the trial judge must make a judgment as the matter unfolds, and the judgment was made. In complete humility, this court is of the opinion that it was not error because of the matters and things hereinabove set forth.
This court, having been called upon to make a determination on whether or not an appealable issue exists in the record in this case, insofar as the petition as to the claim "confession" is concerned, rules that no such issue exists.
AND IT IS SO ORDERED.
NOTES
[1] Counsel for petitioner were given a copy of the presentence report, and the petitioner was given the right of allocution.
[2] The record revealed that a written Notice of Appeal, in accordance with Rules 3 and 4, Rules of Appellate Procedure, was filed on March 28, 1977.
[3] The bail hearing was continued until May 19, 1977, because of the crowded schedule of the court stenographer and the court. All parties recognized that this was necessary in order to get the record in the hands of the attorney and give him time to pursue it.
[4] Trial counsel for defendant.
[4a] United States v. Inman, 352 F.2d 954 (4th Cir. 1965).
[5] Mullins v. United States, 382 F.2d 258 (4th Cir. 1967).
[6] United States v. Sauls, 520 F.2d 568 (4th Cir. 1975) cert. denied, 423 U.S. 1021, 96 S.Ct. 459, 46 L.Ed.2d 393.
[7] 1968 of Volume 2, pages 2112-2123, 2132, etc.
[8] Page 2132 of the Senate Report (Senate Judicial Committee, Report No. 1097, House Judiciary Report No. 488).
[9] Page 2132 (1968) U.S.Code Congressional and Administrative News.
[10] Ibid. Page 2137.
[11] See also State v. Shaw, 284 N.C. 366, 200 S.E.2d 585, 589 (1973).
[12] See also Vincent v. State, 220 Md. 232, 151 A.2d 898, 902 (1959).
[13] In Footnote 7 to the opinion, the court notes:

"Exculpatory statements, denying guilt, cannot be confessions. This ought to be plain enough, if legal terms are to have any meaning."
[14] Davis v. State, 234 Ga. 730, 218 S.E.2d 20, 23 (1975). A "confession" is a statement inconsistent with the possibility of accused's innocence of the crime charged. United States v. Robinson, 148 U.S.App.D.C. 140, 143, 459 F.2d 1164, 1167 (1972).

Testimony of investigator that defendant during in-custody interrogation said he did not know anything about any shooting and suggested he might have been arrested for striking a person who was not the shooting victim was not a "confession" within the United States Supreme Court decision requiring separate hearing on question of voluntariness of the confession. Witt v. State, 124 Ga.App. 535, 184 S.E.2d 517, 518 (1971).
[15] 23 C.J.S. Criminal Law § 816, p. 150.
[16] State v. Miller, 211 S.C. 306, 45 S.E.2d 23 (1947). Also, see Cram v. United States, 316 F.2d 542 (10th Cir. 1963).